# SECRET

FILED WITH THE
COURT SECURITY OFFICER
CSO: _Carl P.F._
DATE: _5/31/2011_

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KHAIRULLA SAID WALI
KHAIRKHWA,

        Petitioner,

        v.

BARACK OBAMA *et al.*,

        Respondents.

:
:
:
:
:
:
:
:
:
:

Civil Action No.:    08-1805 (RMU)

Re Document Nos.:    1, 187, 197

## MEMORANDUM OPINION

### DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS

### DENYING AS MOOT THE GOVERNMENT'S MOTION FOR THE COURT TO CONSIDER *EX PARTE* INFORMATION ON THE MERITS

### OVERRULING THE GOVERNMENT'S OBJECTION TO THE PETITIONER'S RELIANCE ON MATERIALS OUTSIDE THE RECORD

### I. INTRODUCTION

This matter comes before the court on the petition for a writ of habeas corpus filed by

Khairulla Said Wali Khairkhwa (ISN 579) ("the petitioner"), an Afghan national detained at the

United States Naval Station in Guantanamo Bay, Cuba ("GTMO"). The government contends

that the petitioner, a former senior Taliban official, is lawfully detained because he was part of

Taliban forces and purposefully and materially supported such forces in hostilities against the

United States. The petitioner maintains that his detention is unlawful because he was merely a

civilian administrator in the Taliban government with no involvement in the Taliban's military

operations, and because he had disassociated himself from the Taliban by the time of his capture.

In March 2011, the court held a merits hearing to assess the lawfulness of the petitioner's

detention. During the course of that hearing, the parties introduced dozens of exhibits from a

SECRET

variety of classified and public sources, including media reports, scholarly works, interrogation reports and declarations from intelligence analysts. The court also received live testimony and declarations from subject matter experts offered by the petitioner. At the conclusion of the hearing, both parties submitted detailed proposed findings of fact and conclusions of law encapsulating and amplifying the evidence and argument presented during the merits hearing.[1]

Having carefully considered the parties' extensive presentations, the court reaches the following findings. The petitioner was, without question, a senior member of the Taliban both before and after the U.S.-led invasion of Afghanistan in October 2001. The petitioner served as a Taliban spokesperson, the Taliban's Acting Interior Minister, the Taliban Governor of Kabul and a member of the Taliban's highest governing body, the Supreme Shura. The petitioner was a close associate of Taliban leader Mullah Mohammed Omar, who appointed him Governor of the province of Herat in 1999. The petitioner held this office at the time the Taliban government fell to U.S. coalition forces in late 2001.

Although the petitioner contends that he had no military responsibilities in any of his posts within the Taliban, the record belies that contention. The petitioner has repeatedly admitted that after the terrorist attacks of September 11, 2001, he served as a member of a Taliban envoy that met clandestinely with senior Iranian officials to discuss Iran's offer to provide the Taliban with weapons and other military support in anticipation of imminent hostilities with U.S. coalition forces. The petitioner has also exhibited a detailed knowledge about sensitive military-related matters, such as the locations, personnel and resources of Taliban military installations, the relative capabilities of different weapons systems and the locations of

---

[1]     The government has objected to the petitioner's reliance on eleven documents that were not made a part of the record, but are nevertheless cited in the petitioner's proposed findings of facts and conclusions of law. *See generally* Govt.'s Opp. To Petr's Reliance on Materials Outside the Record. The government's objection is overruled.



SECRET

SECRET

weapons caches. Furthermore, the petitioner operated within the Taliban's formal command structure, providing material support to Taliban fighters both before and after the outset of hostilities with U.S. coalition forces. These facts are consistent with the Taliban's governance model, in which nearly all senior Taliban officials were tasked with both civilian and military responsibilities.

Despite the petitioner's efforts to portray himself as a reluctant, marginal figure within the Taliban, the record indicates that the petitioner rose to the highest level of the Taliban and had close ties to Mullah Omar, who repeatedly appointed the petitioner to sensitive, high-profile positions. Indeed, even after the U.S.-led invasion of Afghanistan, the petitioner remained within Mullah Omar's inner circle, despite the fact that Mullah Omar had limited his contacts to only his most trusted commanders.

The petitioner remained part of Taliban forces at the time of his capture in early 2002. Although the petitioner contacted individuals allied with the United States to discuss the possibility of surrendering himself to U.S. coalition forces, he never turned himself in and was ultimately captured at the home of a senior Taliban military commander.

In sum, based on a totality of the evidence, the court concludes that the government has proven by a preponderance of the evidence that the petitioner was part of Taliban forces at the time of his capture. The petitioner is therefore lawfully detained and his petition for a writ of habeas corpus must be denied.



SECRET

SECRET

## II. BACKGROUND

### A. Factual Overview

The following facts are undisputed. The petitioner was born in the Kandahar province of Afghanistan some time between 1967 and 1972. GE 91[2] (Joint Stipulation of Undisputed Facts) ¶ 10; GE 20 (ISN 579 FD-302 (July 2, 2002)) at 1; GE 44 (ISN 579 FD-302 (May 26, 2002)) at 1; GE 45 (ISN 579 FD-302 (May 13, 2002)) at 1; GE 70 (ISN 579 CSRT Summarized Statement (Nov. 8, 2004)) at 1-2. He is a Durrani Pashtu and a member of the Popalzai tribe. GE 91 ¶ 11. Following the Soviet invasion of Afghanistan in 1979, the petitioner relocated with his family to a refugee camp near Quetta, Pakistan. GE 20 at 1. The petitioner spent the bulk of his youth in Pakistan and was educated at different madrassas[3] in that country. GE 91 ¶ 14; GE 43 (ISN 579 MFR (May 10, 2002)) at 1; GE 45 at 1.

In 1994, with the Soviets expelled from Afghanistan and various factions fighting for control over the country, the petitioner returned to Afghanistan. GE 91 ¶ 13. He moved to the village of Spin Boldak in Kandahar province, where he began working for the Taliban. *Id.* In Spin Boldak, the petitioner functioned primarily as a *wayand*, or spokesperson, serving as the Taliban's spokesman to media outlets such as the BBC and Voice of America. GE 20 at 1-2; GE 45 at 1. The petitioner also served as the Taliban's district administrator for Spin Boldak, the

---

[2]    Citations to "GE ___" refer to the exhibits introduced by the government during the merits hearing, whereas citations to "PE ___" refer to the exhibits introduced by the petitioner during the merits hearing.

[3]    "Madrassa" (plural "madaris") derives from the Arabic word for "school." In Pashto, the term is commonly used to refer to religious schools ("deeni madaris"). *See* GE 88 at 20.



SECRET

4

highest-ranking official in that city. GE 71 (ISN 579 ARB Statement (June 22, 2006)) at 3; Mar. 31 Tr. at 87.[4]

The petitioner rose quickly through the Taliban ranks. In 1996, the petitioner was appointed Governor of Kabul, PE 110 ¶ 50, and shortly thereafter, became the Taliban's Acting Minister of the Interior, *id.*; GE 91 ¶ 16. By that time, the Taliban had seized control over southern and central Afghanistan, including Kabul, and were advancing on the Northern Alliance stronghold city of Mazar-e-Sharif.[5] GE 91 ¶¶ 2-3. The Taliban attempted to seize the city in May and September 1997, but both assaults proved unsuccessful. *Id.* ¶ 3. The Taliban finally captured Mazar-e-Sharif in August 1998. *Id.* ¶ 4.

On October 26, 1999, the petitioner was appointed Governor of Herat, *id.* ¶ 17, the westernmost province in Afghanistan, GE 92. The petitioner held this post when U.S. coalition forces commenced Operation Enduring Freedom on October 7, 2001. *See* GE 91 ¶ 5. By mid-November 2001, U.S. coalition forces had pushed the Taliban out of Mazar-e-Sharif, Herat and Kabul. *Id.* ¶¶ 6-8. Kandahar fell in early December 2001. *Id.*

In late January or early February 2002, Pakistani authorities captured the petitioner in Chaman, Pakistan at the home of Abdul Manan Niazi, the former Taliban Governor of Kabul. *Id.* ¶ 18. The petitioner has been detained at GTMO since approximately March 2002.

### B. Procedural History

In June 2008, the Supreme Court issued its ruling in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), in which the Court held that individuals detained at GTMO are "entitled to the privilege

---

[4]    The merits hearing occurred on March 28-31, 2011. Citations to the hearing transcript shall be made by designating the date of the proceedings.

[5]    During the merits hearing, the parties presented a substantial amount of evidence regarding the petitioner's alleged role as a Taliban commander during the assaults on Mazar-e-Shariff. *See infra* Part IV.B.2.

SECRET

of habeas corpus to challenge the legality of their detention," *id.* at 2262, and that the federal district courts have jurisdiction over such challenges, *id.* at 2274. Shortly thereafter, the petitioner filed a petition for a writ of habeas corpus challenging the legality of his detention at GTMO. *See generally* Pet.

Although the Supreme Court did not specify what procedures the district courts were to employ in resolving habeas petitions filed by GTMO detainees, it did emphasize that the "detainees in these cases are entitled to a prompt habeas corpus hearing." *Boumediene,* 128 S. Ct. at 2275. Toward that end, this court and other judges in this district agreed to consolidate their cases before Judge Hogan for the purpose of adopting common procedures for the GTMO detainee litigation. *See* Minute Order (Oct. 29, 2008). On November 6, 2008, Judge Hogan issued a Case Management Order ("CMO") to govern these proceedings, which he amended on December 16, 2008. *See generally* Am. CMO (Dec. 16, 2008). This court adopted the provisions of the amended CMO, subject to modifications set forth in an Omnibus Order issued on April 23, 2009. *See generally* Omnibus Order (Apr. 23, 2009).

The government filed its factual return for the petitioner in December 2008. *See generally* Factual Return. Following an extensive period of discovery, the petitioner filed his traverse in December 2009.[6] *See generally* Traverse. In April 2010, the parties filed cross-motions for judgment on the record. *See generally* Govt's Mot. for J. on the R.; Petr's Cross-Mot. for J. on the R. The court denied the parties' cross-motions after concluding that there were genuine issues of material fact in dispute, and scheduled a merits hearing to begin in November

---

[6]     The court granted the government's motion for leave to amend the factual return in September 2010, Mem. Op. (Sept. 16, 2010) at 3-6, and in early March 2011, granted both the government's unopposed second motion for leave to amend the factual return and the petitioner's unopposed motion for leave to amend the traverse, Order (Mar. 7, 2011). The court granted the government's unopposed third motion for leave to amend the factual return on March 25, 2011. Minute Order (Mar. 25, 2011).

SECRET

~~SECRET~~

2010. Order (Sept. 16, 2010). At the petitioner's request, the court rescheduled the merits hearing to March 2011. Order (Oct. 12, 2010).

The merits hearing began on March 28, 2011 and spanned four days. During the course of the hearing, the parties introduced dozens of exhibits and offered extensive argument concerning the lawfulness of the petitioner's detention. The court also received live testimony from a subject matter expert called by the petitioner. *See infra* Part III.D. At the conclusion of the merits hearing, the parties submitted proposed findings of fact and conclusions of law. With the record now complete, the court turns to the applicable legal standards and the evidence and argument presented by the parties.

## III. EVIDENTIARY MATTERS

### A. Framework for Assessing the Evidence

In assessing whether the government has shown that the petitioner is lawfully detained, the court "must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Bensayah v. Obama*, 610 F.3d 725, 725 (D.C. Cir. 2010) (quoting *Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008)). Thus, when relying on any piece of evidence in these GTMO habeas proceedings, the court must examine that evidence to "determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention." *Khan v. Obama*, 646 F. Supp. 2d 6, 12 (D.D.C. 2009); *see also Naji al Warafi v. Obama*, 704 F. Supp. 2d 32, 38 (D.D.C. 2010) (observing that "[i]n Guantanamo habeas proceedings, the Court must assess the accuracy, reliability, and credibility of each piece of evidence presented by the parties in the context of the evidence as a whole" (internal quotation marks omitted)).


~~SECRET~~

SECRET

The reliability of any piece of evidence may be established by the intrinsic characteristics of that evidence, such as the nature and consistency of the details contained in an account, *Barhoumi v. Obama*, 609 F.3d 416, 428-29 (D.C. Cir. 2010), as well as through corroboration by other evidence in the record, *id.* at 429 (noting that "an intelligence report's reliability can be assessed by comparison to 'exogenous information'"); *Bensayah*, 610 F.3d at 725-26 (citing *Parhat*, 532 F.3d at 849). Two pieces of evidence, "each unreliable when viewed alone," can corroborate each other and mutually establish their reliability. *Bensayah*, 610 F.3d at 726 (citing *United States v. Laws*, 808 F.2d 92, 100-03 (D.C. Cir. 1986)).

In this case, the government has based its case on a variety of classified and public materials, including scholarly works, media reports, expert declarations, intelligence reports, interrogation reports reflecting statements made by the petitioner and other detainees and transcripts of the petitioner's testimony to the Combatant Status Review Tribunal ("CSRT") and the Administrative Review Board ("ARB"). A number of these documents contain multiple levels of hearsay. *See* FED. R. EVID. 801(c). As dictated by this Circuit, the court shall individually assess the reliability of each exhibit that it relies on in the course of its analysis. *See infra* Part IV.

### B. Admissibility and Reliability of Hearsay Evidence

Prior to the merits hearing, the government submitted a motion in which it argued that the court should afford a presumption of accuracy and authenticity to its hearsay evidence. *See generally* Govt's Hearsay Mot. Noting that the motion was substantively identical to motions resolved by this court in other GTMO cases, the court granted in part and denied in part the government's motion in an order issued prior to the merits hearing. Order (Mar. 17, 2011) (citing *Alsabri v. Obama*, 2011 WL 576064, at *5-6 (D.D.C. Feb. 3, 2011); *Hatim v. Obama*, 677

SECRET

SECRET

F. Supp. 2d 1, 7-10 (D.D.C. 2010), *rev'd on other grounds*, 632 F. 3d 720 (D.C. Cir. 2011)). The reasoning underlying the court's ruling is set forth in greater detail below.

The Circuit has made clear that although "hearsay evidence is always admissible in Guantanamo habeas proceedings, such evidence must be accorded weight only in proportion to its reliability." *Barhoumi*, 609 F.3d at 428 (D.C. Cir. 2010). As the Circuit has stated, "the question a habeas court must ask when presented with hearsay is not whether it is admissible – it is always admissible – but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010).

Nothing in these Circuit decisions suggests that the court should presume the accuracy or reliability of the government's exhibits; to the contrary, as previously noted, the Circuit has stated that before relying on any piece of evidence, the court must determine that it is sufficiently reliable and probative. *Bensayah*, 610 F.3d at 725 (citing *Parhat*, 532 F.3d at 847); *cf. Al Odah v. Obama*, 611 F.3d 8, 14 (D.C. Cir. 2010) (holding that the district court did not err in relying on hearsay evidence where "[t]he government offered reasons why its hearsay evidence had indicia of reliability, and the court considered the reliability of the evidence in deciding the weight to give the hearsay evidence").

Drawing on these principles, this court has held that although hearsay evidence is always admissible in these habeas proceedings, the court cannot presume the accuracy of such evidence, but must instead make individualized determinations about the reliability and accuracy of that evidence and the weight it is to be afforded. *Alsabri*, 2011 WL 576064, at *5 (citing *Hatim*, 677 F. Supp. 2d at 10)). The court has also held that based on the principles underlying Federal Rule of Evidence 803(6), which sets forth the hearsay exception for reports of regularly conducted activity, the government's interrogation reports and intelligence reports are entitled to a

SECRET

SECRET

presumption of authenticity. *Id.*; *see also Almerfedi v. Obama*, 2010 WL 691944, at *1 (D.D.C. Mar. 1, 2010) (concluding that all of the government's hearsay evidence was admissible and that any evidence created and maintained by the government in the ordinary course of business was entitled to a rebuttable presumption of authenticity, but rejecting the government's argument that its evidence should be afforded a presumption of accuracy). As described below, the court has applied the same framework in assessing the hearsay evidence introduced by the government in this case. *See infra* Part IV.

## C. Reliance on *Ex Parte* Information

During the course of this litigation, the government has filed a number of motions for leave to provide the petitioner with redacted versions of certain documents that are subject to the automatic disclosure provisions of the CMO. The motions were brought pursuant to § I.F of the CMO, which provides that "[i]f the government objects to providing the petitioner's counsel with classified information [otherwise subject to disclosure], the government shall move for an exception to disclosure." CMO § I.F. Relying on the Circuit's ruling in *Al Odah*, the court issued a series of rulings on these motions, ultimately granting the government leave to redact portions of certain documents disclosed to the petitioner. *See, e.g.*, Mem. Order (May 25, 2010); Mem. Order (Oct. 5, 2010) (granting in part and holding in abeyance in part the government's renewed fourth *ex parte* motion for exception from disclosure and directing the government to provide further explanation for its redaction to one document); *see also Al Odah v. United States*, 559 F.3d 539, 545-47 (D.C. Cir. 2009) (concluding that the court may order the disclosure of classified information to the petitioner only if the evidence is material, access by petitioner's counsel is necessary to facilitate meaningful habeas review and there are no adequate alternatives to disclosure).

SECRET

SECRET

In June 2010, the petitioner filed a motion seeking access to the government's *ex parte* filings. *See generally* Petr's Mot. for Access to *Ex Parte* Filings. The court denied the motion, concluding that § I.F of the CMO contemplates *ex parte* applications for exceptions from disclosure. Mem. Op. (Sept. 16, 2010) at 6-9. In so ruling, however, the court noted that it had no intention of relying on any redacted, *ex parte* information in determining the legality of the petitioner's detention.[7] *Id.* at 8-9.

On March 27, 2011, the government filed a motion, in which it argued that the court should, in assessing the lawfulness of the petitioner's detention, consider *ex parte* certain information redacted from the documents disclosed to the petitioner.[8] *See generally* Govt's Mot. that the Court Consider on the Merits Information Contained in Its 3d & 5th CMO § I.F. Motions ("Govt's Mot. for *Ex Parte* Consideration"). According to the government, the Circuit's ruling in *Al Odah* implicitly acknowledges the court's authority to rely on *ex parte* materials when the petitioner's access to that information is not necessary to facilitate the court's meaningful review. *See generally id.* The petitioner disagrees, citing the well-established presumption against the court's reliance on materials to which both parties do not enjoy access. *See generally* Petr's Opp'n to Govt's Mot. for *Ex Parte* Consideration.

The court is aware that at least one judge in this district has relied on *ex parte* information to assess the reliability of materials submitted by the government during a merits hearing. *See Khan v. Obama*, 741 F. Supp. 2d 1, 17 (D.D.C. 2010) (noting that the court conducted an *ex parte* review of unredacted copies of certain intelligence reports to assess their reliability). In this immediate case, however, the court finds it unnecessary to rule on the issue because, as

---

[7]     The court reiterated this position in its ruling on the government's fifth *ex parte* motion for exception from disclosure. Mem. Order (Mar. 11, 2011) at 3 n.11.

[8]     The government submitted unredacted versions of the documents at issue with its *ex parte* motions for exception from disclosure. SECRET

11

SECRET

discussed below, the evidence to which both parties had access amply establishes the lawfulness of the petitioner's detention. *See infra* Part IV. Accordingly, the court denies the government's motion as moot.

### D. Qualification of the Petitioner's Experts

During the merits hearing, the petitioner sought to introduce testimony from two individuals proffered as expert witnesses: Hekmat Karzai and Brian Williams. Karzai submitted a declaration on the petitioner's behalf, *see generally* PE 110 (Decl. of Hekmat Karzai), and testified at the merits hearing, *see* Mar. 31 Tr. at 45-152. Williams also offered a declaration on the petitioner's behalf, *see generally* PE 111A (Decl. of Brian Williams), though he did not testify at the merits hearing.[9]

Following extensive voir dire by the government, the court concluded that Karzai was qualified to offer expert testimony on each of the matters addressed in his declaration. Mar. 31 Tr. at 92. The court also heard extensive argument from the parties regarding Williams's qualifications to offer expert testimony in this case, though it declined to rule on the matter during the hearing.

In the following sections, the court explains in greater detail the basis for its ruling on Karzai's qualifications and assesses the expert qualifications of Williams. The court begins by briefly recounting the general principles governing the qualification of expert witnesses.

### 1. Legal Standard for the Qualification of Expert Witnesses

Federal Rule of Evidence 702 provides that a witness must qualify as an expert to testify on matters that are scientific, technical or specialized in nature. *See* FED. R. EVID. 702. The court must act as a "gatekeeper" and determine the admissibility of expert testimony and the

---

[9]     Neither Karzai nor Williams obtained access to or testified on the basis of classified materials in this case.

SECRET

SECRET

qualifications of expert witnesses. *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)). The trial court's gatekeeping obligation applies not only to scientific testimony but to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).

In general, Rule 702 has been interpreted to favor admissibility. *See Daubert*, 509 U.S. at 587; *see also* FED. R. EVID. 702 advisory committee's note (2000) ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."). The adversarial system remains the "traditional and appropriate" mechanism for exposing "shaky but admissible evidence." FED. R. EVID. 702 advisory committee's note (2000) (quoting *Daubert*, 509 U.S. at 596). Nonetheless, the party presenting the expert bears the burden, by a "preponderance of proof," of establishing the qualifications of the proposed expert. *Meister*, 267 F.3d at 1127 n.9.

Rule 702 does not specify any particular means for qualifying an expert, requiring only that the witness possess the "knowledge, skill, experience, training, or education" necessary to "assist" the trier of fact. FED. R. EVID. 702. As the Supreme Court stated in *Daubert*, the trial court must determine whether the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592. In considering whether this standard is met, courts may consider the factors articulated in *Daubert*, such as (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.*

SECRET

SECRET

The Supreme Court has, however, noted that the *Daubert* factors are not exclusive and may not apply in all cases. *Kumho Tire Co.*, 526 U.S. at 150-51 (noting that Rule 702 envisions a "flexible" inquiry). In cases in which the *Daubert* factors do not apply, "reliability concerns may focus on personal knowledge or experience." *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (citing *Kumho Tire Co.*, 526 U.S. at 149). Formal education ordinarily suffices, and a person who holds a graduate degree typically qualifies as an expert in his or her field. *See, e.g., Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176-77 (5th Cir. 2010); *Am. Gen. Life. Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338-39 (11th Cir. 2009).

There is, however, no requirement that an expert possess formal education, and an expert may be qualified on the basis of his or her practical experience. *See, e.g., Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269-70 (9th Cir. 1994) (concluding that a longshoreman with twenty-nine years of experience in various positions within the industry was qualified to testify as an expert about proper safety procedures). As noted in the advisory committee notes to Rule 702, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note (2000).

The degree of "knowledge, skill, experience, training, or education" required to qualify an expert witness "is only that necessary to insure that the witness's testimony 'assist' the trier of fact." *See Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981) (noting that the weight of the evidence is a matter to be assessed by the trier of fact). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a



SECRET

recognized professional community." 29 FED. PRAC. & PROC. (EVID.) § 6265. "The 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id.*

### 2. Hekmat Karzai

Hekmat Karzai, one of the proposed experts on whom the petitioner relies, is the Director of the Centre for Conflict and Peace Studies, an independent research institute in Afghanistan dedicated to reducing the threat of political violence and fostering an environment of peace and stability in that nation. PE 110 ¶¶ 1-2. Karzai earned a master's degree in strategic studies, focusing on issues such as terrorism, militancy and insurgency, has authored scholarly works on the Taliban and its relationship with al-Qaida, has traveled extensively in the region and is personally acquainted with many former Taliban leaders as well as local Afghan officials. *Id.* ¶¶ 4-6; Mar. 31 Tr. at 46-49, 52. He is also a senior fellow at the Joint Special Operations University, Special Operations Command for the United States Military and regularly briefs senior U.S. commanders in Afghanistan. Mar. 31 Tr. at 46-49.

The petitioner offered Karzai to provide expert testimony on the following subjects: (1) background on the Taliban government and its relations with Iran; (2) a profile of Mullah Omar; and (3) the petitioner's background and his role within the Taliban government. PE 110 ¶ 7. Following a lengthy voir dire, the government conceded Karzai's qualifications to offer expert testimony on the first two of these issues. Mar. 31 Tr. at 89. The government objected, however, to Karzai offering expert testimony on the third issue, arguing that his views on the petitioner's roles within the Taliban were based more on *ipse dixit* than on rigorous analysis. *Id.* at 89-90. The government noted that Karzai had published no scholarly works about the petitioner and based his opinions about the petitioner primarily on his discussions with



SECRET

individuals associated with the petitioner rather than on any rigorous analytical inquiry. *Id.* at 90. In effect, the government argued, the petitioner was attempting to introduce hearsay evidence in the guise of expert testimony. *Id.* at 91.

The court overruled the government's objection based on the following considerations: having authored a master's thesis on the relationship between the Taliban and al-Qaida, as well as numerous scholarly works on the Taliban and Afghanistan, Karzai had amassed over a decade of experience conducting research on issues related to the Taliban and Afghanistan by the time he began researching the petitioner in 2006. *Id.* at 44-49, 86. Accordingly, Karzai plainly possessed the training and experience necessary to conduct research into the petitioner, a prominent and senior member of the Taliban government.

Indeed, it would appear that in a manner consistent with his training and experience, Karzai conducted a systematic inquiry into the petitioner. Karzai testified that he formed his opinions about the petitioner's background and posts within the Taliban by interviewing numerous people associated with him, including his family, those who worked with him in the Taliban government on a daily basis and current senior Afghan government officials. *Id.* at 83-85. He also consulted primary and secondary sources, such as local Afghan publications, for information regarding the petitioner's role within the Taliban. *Id.* at 84. Karzai testified that he sought out a variety of individuals with firsthand knowledge about the petitioner, speaking not only with individuals from Taliban-dominated southern Afghanistan, but also with individuals from both the Mazar-e-Sharif region in the north and Herat province in western Afghanistan. *Id.* at 89. Moreover, Karzai attempted to verify the information he obtained from any source by seeking corroboration through other sources. *Id.* at 86-87.



16

SECRET

The government did not explain why Karzai's reliance on information that he obtained from these interviews precludes him from offering expert testimony, particularly in light of his efforts to cross-reference and corroborate this information.[10] Although the government suggested that the rigor of Karzai's inquiry was undermined by his personal desire to see the petitioner freed, Mar. 31 Tr. at 90-91, in the court's view, this factor is relevant to the weight afforded to Karzai's testimony, not his expertise.

Accordingly, based on Karzai's knowledge, training and experience regarding the Taliban and his efforts to research the petitioner's background and roles within the Taliban, the court concluded during the merits hearing that Karzai was qualified to offer expert testimony on the petitioner's background and posts within the Taliban.

### 3. Brian Williams

Brian Williams is a professor of Islamic History at the University of Massachusetts-Dartmouth, where he has taught since 2001. PE 111A ¶ 1. He has a doctoral degree in Central Asian History, as well as a master's degree in Russian History and Central Eurasian Studies. *Id.* Williams has authored more than seventy articles on war and terrorism in Central Eurasia. *Id.* He has testified as an expert in other GTMO proceedings. *See, e.g.*, *Khan*, 741 F. Supp. 2d at 8 (noting that Williams offered expert testimony on Afghan warlords).

In his declaration, Williams offers expert opinion testimony on the following four subjects: (1) the Taliban's conquest of Mazar-e-Sharif; (2) Iranian-Taliban cooperation against the United States; (3) intelligence sharing between the Taliban and Iran; and (4) al-Qaida bases

---

[10]   Indeed, one of the works which the government has described as an authoritative source on the Taliban relies on information obtained from precisely the sort of interview which the government deemed unreliable during its voir dire of Karzai. *See* GE 48 (AHMED RASHID, TALIBAN: MILITANT ISLAM, OIL AND FUNDAMENTALISM IN CENTRAL ASIA (2000)) at 90-91 (describing information obtained from an interview with Samiul Haq, leader of the Dar-ul-Uloom Haqqania madrassa).

SECRET

SECRET

located in Herat. *See generally* PE 111A. The government does not dispute Williams's

qualifications to offer testimony on subjects one and four. Mar. 31 Tr. at 6. The government

asserts, however, that Williams lacks the qualifications necessary to offer expert testimony on

subjects two and three, both of which concern the relationship between the Taliban and Iran. *Id.*

More specifically, the government contends that Williams has little expertise on Afghanistan or

the Taliban, having focused the majority of his scholarly endeavors on the Russian Caucasus and

Turkey, and that he has no specialized education or training on Iran. *Id.* at 6-21. The

government also points to mistakes and inconsistencies in testimony offered by Williams in other

GTMO proceedings as evidence of his lack of expertise. *Id.* at 22-30.

The court disagrees with the government's assessment of Williams's expertise. The

government itself has previously relied on Williams as an expert on the Taliban. Williams

authored a book published in 2001 by U.S. Army Publications entitled "Afghanistan 101: A

Guide to the Afghan Theater of Operations," GE 100 ¶ 5, and has lectured on the Taliban and

Afghanistan at the U.S. Special Operations Command at Macdill Air Force Base ("The Role of

Foreign Fighters in the Taliban Insurgency"), Air Force Special Operations Command at

Hurlburt Airfield ("Waging Counter-Insurgency in Afghanistan 1842-2008"), the Joint

Information Operations Warfare Command at Lackland Air Force Base ("Background on Islam,

Suicide Terrorism and Jihad in the Middle East") and the Central Intelligence Agency's Counter

Terrorist Center ("Profiling Afghan Suicide Bombers"), GE 111B (Curriculum Vitae of Brian

Williams) at 9-10. Williams has worked for a U.S. Army Information Operations team at NATO

Headquarters in Kabul and wrote the Joint Information Operations Warfare Command's field

manual on Afghanistan. PE 111A ¶ 2.



SECRET

Williams has traveled to Afghanistan on four occasions since the fall of the Taliban government. *Id.* He has also authored articles discussing Afghanistan in the age of Taliban-rule that have been published in scholarly journals,[11] as well as policy journals and other collections.[12] PE 111B at 3-7. Furthermore, Williams has taught at least one course covering modern Afghan history, including the period of the Taliban, titled "Empires and Invasions: A History of Afghanistan from Genghis Khan to the War on Terror." GE 95 at 1.

Given his demonstrated scholarship on the history of the Taliban, as well as the government's own reliance on him as an expert on matters related to the Taliban, it is clear that Williams possesses the specialized knowledge needed to offer expert opinion testimony on the Taliban and Afghanistan. Indeed, as previously noted, the government has conceded that Williams is qualified to offer expert testimony about the battle for Mazar-e-Sharif during the rise of the Taliban and about the presence of al-Qaida bases in Herat province during the Taliban's rule over Afghanistan. *See* Mar. 31 Tr. at 6.

Such expertise could not be obtained without developing a specialized knowledge of the Taliban's relationships with its regional neighbors, including Iran. It is well-established that Iran, which shares a 400-mile border with Afghanistan, played a central role in Afghan affairs during the Taliban's rise to power, providing substantial military support to the Northern Alliance and other groups in their struggle for control of Afghanistan. *See, e.g.*, PE 75 (Thomas H. Johnson, *Ismail Khan, Herat, and Iranian Influence*, 3 STRATEGIC INSIGHTS, no. 7, July 2004, at 1) at 3; PE 76 (Mohsen M. Milani, *Iran's Policy Towards Afghanistan*, 60 MIDDLE E.J., no. 2,

---

[11]   *See, e.g.*, Brian Williams, *Report from the Field. General Dostum and the Mazar i Sharif Campaign: New Light on the Northern Alliance Warlords in Operation Enduring Freedom*, 21 SMALL WARS AND INSURGENCIES, no. 4, Dec. 2010, at 610, 611-15.

[12]   *See, e.g.*, Brian Williams, *The Failure of Al Qaeda Basing Projects: From Soviet Afghanistan to the Sunni Triangle*, *in* DENIAL OF SANCTUARY. UNDERSTANDING TERRORIST SAFE HAVENS 49, 58-59 (Michael Innes ed. 2007).   SECRET

SECRET

Spring 2006, at 235) at 244 (noting that Iran provided key support to the Northern Alliance during the battle for Mazar-e-Sharif, in which the Taliban ultimately prevailed with the aid of Pakistan).

Although the fact that Williams has little demonstrated expertise in Iran is relevant to the weight that the court ascribes to his views on the relationship between the Taliban and Iran, it does not preclude him from offering expert testimony on the issue. Accordingly, the court concludes that Williams is qualified to offer expert opinion testimony on all of the issues for which he has been proffered.

## IV. ANALYSIS

### A. The Scope of the Government's Detention Authority

The government's authority to detain individuals at GTMO derives from the

Authorization for the Use of Military Force ("AUMF"), which provides that

> the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attack that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.

Pub. L. No. 107-40, 115 Stat. 224 (2001).

This Circuit has delineated two categories of persons detainable under the AUMF: (1) individuals who are "part of" forces associated with al-Qaida or the Taliban and (2) individuals who purposefully and materially supported such forces in hostilities against U.S. coalition forces. *Al Bihani*, 590 F.3d at 872; *see also id.* at 874 (noting that "both prongs are valid criteria that are independently sufficient to satisfy the standard"). The burden rests with the government to demonstrate by a preponderance of the evidence that the detainee falls within one of these



SECRET

categories of detainable persons. *See Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010) (stating

that "a preponderance of the evidence standard satisfies constitutional requirements in

considering a habeas petition from a detainee held pursuant to the AUMF"); *accord Al Bihani*,

590 F.3d at 878.[13]

The Circuit has observed that because al-Qaida's organizational structure is amorphous,

"it is impossible to provide an exhaustive list of criteria for determining whether an individual is

'part of' al Qaeda." *Bensayah*, 610 F.3d at 725. Accordingly, the district courts must determine

whether an individual is "part of" al-Qaida or associated forces on a "case-by-case basis"

employing a "functional rather than a formal approach and by focusing upon the actions of the

individual in relation to the organization." *Id.* "That an individual operates within al Qaeda's

formal command structure is surely sufficient but is not necessary to show that he is 'part of' the

organization." *Id.*; *see also Awad*, 608 F.3d at 11 ("If the government can establish by a

preponderance of the evidence that a detainee was part of the 'command structure' of al Qaeda,

this satisfies the requirement to show that he was 'part of' al Qaeda. But there are ways other

than making a 'command structure' showing to prove that a detainee is 'part of' al Qaeda."). On

the other hand, "the purely independent conduct of a freelancer is not enough" to show that an

individual is detainable as "part of" of those enemy forces. *Bensayah*, 610 F.3d at 725; *see also*

*Salahi v. Obama*, 625 F.3d 745, 752 (D.C. Cir. 2010) (noting that "the government's failure to

prove that an individual was acting under orders from al-Qaida may be *relevant* to the question

of whether the individual was 'part of' the organization when captured").

---

[13]     Nevertheless, the Circuit has expressly left open the question of whether a lower evidentiary
standard might be constitutionally permissible. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1103
(D.C. Cir. 2010); *see also Esmail v. Obama*, 2011 WL 1327701, at *3 (D.C. Cir. Apr. 8, 2011)
(Silberman, J., concurring) (stating that "in a habeas corpus proceeding the preponderance of
evidence standard that the government assumes binds it, is unnecessary – and moreover,
unrealistic").

21

SECRET

The government's "authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released." *Awad*, 608 F.3d at 11. The government must prove, however, that the petitioner was "part of" the Taliban, al-Qaida or associated forces at the time of his capture to demonstrate that his detention is lawful under the first prong of the standard. *See Salahi*, 625 F.3d at 751 (observing that "the relevant inquiry is whether [the petitioner] was 'part of' al-Qaida when captured"); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 71 (D.D.C. 2009).

Few courts have delved at length into the "purposeful and material support" prong of the detention standard. It is nonetheless clear that as with the "part of" prong of the detention standard, the inquiry into whether an individual has purposefully and materially supported hostilities against U.S. coalition forces requires a fact-specific assessment focusing on the actions of the individual in relation to the organization. *See Al-Bihani*, 590 F.3d at 873 (noting that even if the detainee could prove that he was a civilian "contractor" and was not a formal member of the Taliban, the services that he provided to Taliban fighters engaged in hostilities against U.S. coalition forces, such as cooking for the unit and carrying a brigade-issued weapon, would render him detainable under the support prong of the detention standard).

In assessing whether the government has met its burden under either prong of the detention standard, the court may not view each piece of evidence in isolation, but must consider the totality of the evidence. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1105-06 (D.C. Cir. 2010). Even if no individual piece of evidence would by itself justify the petitioner's detention, the evidence may, when considered as a whole and in context, nonetheless demand the conclusion that the petitioner was more likely than not "part of" the Taliban or al-Qaida or that the petitioner purposefully and materially supported such forces. *Id.* (concluding that the district court erred in



SECRET

"requir[ing] each piece of the government's evidence to bear weight without regard to all (or indeed any) other evidence in the case"); *cf. Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987) (observing that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it" because the "sum of an evidentiary presentation may well be greater than its constituent parts").

## B. The Petitioner Is Lawfully Detained

### 1. The Petitioner Was a Senior Taliban Official

In many of the GTMO habeas cases litigated since *Boumediene*, the central question before the court has been whether the detainee knowingly associated himself with the Taliban, al-Qaida or related enemy forces. To resolve this question, courts have commonly sifted through evidence of the detainee's presence at training camps and safehouses and assessed the plausibility of the detainee's claim that he had no intention of joining forces hostile to the United States. *See, e.g., Alsabri*, 2011 WL 576064, at *9-32 (analyzing evidence that the detainee had stayed at al-Qaida and Taliban-affiliated guesthouses and training camps and evaluating the detainee's assertion that he traveled from Yemen to Afghanistan to find work and a wife); *Kandari v. United States*, 744 F. Supp. 2d 11, 27-29 (D.D.C. 2010) (assessing the detainee's assertion that he traveled to Pakistan and then to Afghanistan to obtain religious training and perform charitable work); *Almerfedi v. Obama*, 725 F. Supp. 2d 18, 22-31 (D.D.C. 2010) (evaluating the detainee's claim that he traveled from Yemen to Pakistan in the hopes of facilitating a missionary trip to Europe, as well as the government's evidence that the petitioner stayed at al-Qaida affiliated guesthouses).

This case proceeds from a different footing. Here, there is no dispute about the petitioner's long history as a member of the Taliban. As previously noted, the petitioner



23

SECRET

acknowledges that he began working for the Taliban in 1994 and that he served as the Taliban's

district administrator in Spin Boldak and spokesperson to media outlets such as the BBC and

Voice of America. GE 91 ¶ 15; GE 20 at 1-2; GE 45 at 1; GE 70 at 1-2; GE 71 at 3; GE 110 ¶

48. It is undisputed that the petitioner was appointed Governor of Kabul in 1996 and, shortly

thereafter, became the Taliban's Acting Interior Minister. GE 91 ¶ 16; GE 110 ¶ 50. It is also

undisputed that in October 1999, the petitioner was appointed Governor of Herat province, a

position that he held through the commencement of Operation Enduring Freedom. GE 91 ¶¶ 5,

17. In short, the parties agree that the petitioner was not only functionally part of the Taliban,

but that he was, in fact, a formally-recognized, high-ranking Taliban official at the time of the

U.S.-led invasion of Afghanistan.

As a result, the question before the court is not whether the petitioner ever knowingly

associated himself with the Taliban, but instead, whether the nature and duration of that

association renders him lawfully detained under the AUMF. The government contends that the

petitioner is lawfully detained because he was deeply involved in the Taliban's military

operations throughout his tenure with the Taliban, had close ties to Mullah Omar and remained

part of the Taliban at the time of his capture in early 2002.[14]  The petitioner, in turn, asserts that

although he was a senior Taliban official, he had no involvement with the Taliban's military

---

[14]     During the merits hearing, the government raised a host of additional allegations against the
petitioner, including allegations that the petitioner had ties to Usama bin Ladin, harbored al-
Qaida operatives in Herat during his tenure as Governor of Herat and commanded a Taliban
garrison at Mazar-e-Sharif during Operation Enduring Freedom. The court declines to address
these allegations because the evidence analyzed below is sufficient to establish the lawfulness of
the petitioner's detention. *Cf. Esmail*, 2011 WL 1327701, at *1-3 (affirming the district court's
denial of the GTMO detainee's habeas petition, despite the petitioner's argument that the district
court erred in relying on coerced statements and uncorroborated evidence, because "the record
contains sufficient facts – affected neither by the alleged coercion nor by the lack of
corroboration – to support the district court's conclusion that [the detainee] was 'part of' al
Qaeda at the time of his capture").

SECRET

operations, had no meaningful relationships with senior Taliban leaders and had disassociated himself from the Taliban by the time of his capture. The court considers these matters in turn.

## 2. The Petitioner's Involvement With Taliban Military Operations

Throughout this litigation, the petitioner's chief contention has been that he was merely a civilian administrator who had no involvement with the Taliban's military operations. According to the petitioner, the evidence purporting to show that he had obtained military training and experience and possessed military responsibilities is inherently flawed and unreliable. The petitioner also relies on the statements of expert witnesses and former Taliban officials who claim that the petitioner was merely a civilian bureaucrat with no military responsibilities. The petitioner asserts that as a purely civilian official, he was not part of Taliban forces, did not purposefully and materially support the Taliban in hostilities against U.S. coalition forces, and, as a result, is not lawfully detained.

The government does not dispute that a purely civilian official who had no connection to any military activities would not be subject to detention under the AUMF. According to the government, however, the evidence overwhelmingly indicates that like almost all Taliban leaders, the petitioner obtained military training and experience fighting with the Afghan mujahideen in the 1980s, and remained deeply involved in the Taliban's military operations until the time of his capture in early 2002. The court assesses this evidence in the following sections.

### a. The Petitioner's Involvement With the Anti-Soviet Afghan Mujahideen

In December 1979, Soviet forces invaded Afghanistan and attempted to occupy the country. PE 76 at 237-39. Over the next decade, they fought a protracted guerilla war against a loosely allied coalition of Afghan mujahideen fighters and foreign fighters who had traveled to Afghanistan to wage jihad against the Soviets. PE 67 (RASHID, TALIBAN, *supra*) at 197-98.



SECRET

In 1989, Soviet forces withdrew from Afghanistan. *Id.* at 198-99. Without Soviet military assistance, the pro-Soviet Afghan government collapsed. PE 70 (NEAMATOLLAH NOJUMI, THE RISE OF THE TALIBAN IN AFGHANISTAN (2002)) at 141. During the ensuing struggle for power, Afghanistan descended into civil war. PE 76 at 199-200; PE 110 ¶¶ 8-10.

It was during this period of civil strife that the Taliban emerged, originating from madrassas in Afghanistan and Pakistan. *See* GE 88 (KAMAL MATINUDDIN, THE TALIBAN PHENOMENON (1999)) at 21 ("The most widely circulated theory is that the leadership of the Taliban emerged from amongst the disgruntled Afghan refugees studying in the *deeni madaris* [religious schools] around Quetta and Peshawar."). As Karzai explains in his declaration,

> Afghan refugees based in Baluchistan and North West Frontier Province (NWFP) had been encouraged to join the growing number of radical madrassas during the resistance against the former Soviet Union. By 1994, there were thousands of Taliban students who had received basic military training. The movement was led by a veteran of the Afghan Jihad, Mullah Mohammad Omar.

PE 110 ¶ 9.

According to Ahmed Rashid,[15] whose book *Taliban* is acknowledged by both parties to be an authoritative account of the history of the Taliban, nearly all of the Taliban's senior leaders were veterans of the anti-Soviet mujahideen who had been educated at madrassas in Afghanistan and Pakistan. *See* GE 48 at 252-55. For instance, Mullah Omar, a founder of the Taliban and its supreme leader, had fought against the Soviets as part of the mujahideen faction led by Yunas Khalis and had attended various madrassas in Kandahar province. *Id.* at 253. Mullah Mohammed Hassan, the Taliban's Foreign Minister, had attended a madrassa in Quetta, Pakistan and also fought under Yunas Khalis in the Afghan mujahideen. *Id.* Mullah Amir Khan Muttaqi,

---

[15]     Ahmed Rashid is a journalist who has reported on Afghanistan for more than twenty years, first as a correspondent for the *Far Eastern Economic Review* and, more recently, for the *BBC Online*, the *Washington Post* and the *International Herald Tribune*. GE 48 at 1.


SECRET

SECRET

the Taliban's Culture and Information Minister, and Mullah Maulvi Qalamuddin, Head of the Taliban's Religious Police, were both former Afghan mujahideen commanders, members of the Harakat Mujahideen party led by Mohammed Nabi Mohammedi and educated at the Dar-ul Uloom Haqqania madrassa near Islamabad, Pakistan.[16]  GE 48 at 253-54. Mullah Mohammed Abbas, the Taliban Health Minister, and Mullah Jalaluddin Haqqani, Minister of Frontier Affairs, were also educated at the Dar-ul Uloom Haqqania madrassa and had fought against the Soviets with the Afghan mujahideen under Yunis Khalis. *Id.*

As reported by Rashid, the petitioner, who became the Taliban's Acting Interior Minister and a member of its Supreme Shura, fit this mold precisely. More specifically, Rashid reports that the petitioner was a graduate of the Dar-ul Uloom Haqqania madrassa, a member of Mohammed Nabi Mohammedi's Harakat Mujahideen party and a former mujahideen commander during the Soviet occupation. *Id.* at 252.

The petitioner's expert witnesses have acknowledged the reliability of Rashid's reporting on the Taliban. Williams states in his declaration that Rashid's *Taliban* is the most significant work on the history of the Taliban and a "must read for anyone trying to understand the events in this case." PE 111A ¶ 5. Karzai similarly testified that Rashid possesses an understanding of Afghanistan that is superior to that of most other purported experts and noted that Rashid's account of the history of the Taliban was more reliable than other works because it resulted from Rashid's field work in Afghanistan. Mar. 31 Tr. at 129. The fact that the petitioner's own expert

---

16  Dar-ul Uloom Haqqania has been referred to in media reports as the "university of jihad," GE 68 (Noreen S. Ahmed-Ullah and Kim Barker, *Schooled in Jihad*, CHICAGO TRIBUNE, Nov. 28, 2004) at 3, and as "the breeding ground of Taliban fundamentalism," GE 21 (Rory McCarthy, *Dilemma – Pakistan's Clerics Plot Downfall of Military Regime: Support for US Could Spark Hardline Uprising*, THE GUARDIAN, Sept. 18, 2001) at 2. The leader of the madrassa, Samiul Haq, has praised Usama bin Ladin as a "brave and courageous man." GE 68 at 1. According to Rashid, Haq's madrassa "became a major training ground for the Taliban leadership." GE 48 at 90.

SECRET

27

SECRET

witnesses have acknowledged the authoritativeness of Rashid's reporting supports the reliability of his report that the petitioner fought against the Soviets with the Afghan mujahideen.

The court also notes that Rashid's reporting on the backgrounds of other senior Taliban leaders is independently corroborated by other information in the record. For instance, Rashid's report that Mullah Omar received a madrassa education in Kandahar and fought with the Afghan mujahideen faction led by Yunas Khalis, GE 48 at 252, is corroborated by Karzai, who has also written articles about Mullah Omar, Mar. 31 Tr. at 79, and stated in his declaration that Mullah Omar was "educated in various madrassas in Kandahar," PE 110 ¶ 40, and had "participated in the Jihad against the Soviet and Afghanistan communist government under the faction led by Yunas Khalis," *id.* ¶ 42. Similarly, Rashid's report that Mullah Qalamuddin, the Taliban's Head of Religious Police, was educated at the Dar-ul Uloom Haqqania madrassa is corroborated by a September 2001 article about the Dar-ul Uloom Haqqania madrassa in the *The Guardian* newspaper. GE 21 at 2 (reporting on an interview with Samiul Haq and listing the Taliban's "first head of the religious police Qalam Uddin" as a graduate of Haq's Dar-ul Uloom madrassa). Tellingly, the petitioner has identified no other instance in which Rashid has provided incorrect information about the background of any other senior Taliban leader.[17]

Indeed, much of Rashid's account of the petitioner's background is independently corroborated by other evidence in the record. For instance, Rashid reports that the petitioner was born in Kandahar province, is a Durrani Pashtun and is a member of the Popalzai tribe, GE 48 at 253, all of which are facts to which the parties have stipulated, GE 91 ¶ 11. Moreover, Karzai, who conducted an independent inquiry into the petitioner, *see supra* Part III.D.2, acknowledged

---

[17]    The petitioner notes that one media report states that Mullah Omar attended the Dar-ul Uloom madrassa, GE 68 at 2, which differs from Rashid's account, *see* GE 48 at 91. This inconsistency does not call into question the reliability of Rashid's reporting, as the petitioner's own expert has corroborated Rashid's account of Mullah Omar's education at madrassas in Kandahar. PE 110 ¶ 40.



SECRET

during his testimony that the petitioner had attended the Dar-ul Uloom Haqqania madrassa and was, at least for a time, a member of the Harakat Mujahideen party of Mohammad Nabi Mohammadi, Mar. 31 Tr. at 139, 142, facts also reported by Rashid, GE 48 at 253. Likewise, the September 2001 article in *The Guardian* discussing Samiul Haq identifies the petitioner as one of the most prominent alumni of the Dar-ul Uloom Haqqania madrassa. GE 21 at 2.

Moreover, although the petitioner has given contradictory accounts of his actions during the Soviet occupation, he has admitted on multiple occasions that while living in Pakistan, he traveled to Afghanistan to obtain military training and fight with the Afghan mujahideen against the Soviets.[18] GE 43 at 1; GE 45 at 1; GE 71 at 6-7. During a [2] interrogation, the petitioner stated that "[t]he only military training he has [received] consisted of a short period of time at Camp Marof, near Kandahar, when [he] was in his teens. This camp, who[se] Commandant was Abdul Raziq, was a Mujahadeen training facility where people were sent during the AF/Soviet war." GE 45 at 1. Later, during a [2] interrogation, the petitioner acknowledged that "he traveled twice to [Afghanistan] to join the jihad against the communists" and attended "a mujahideen training camp in Marof" operated by Abdul Raziq, though the petitioner denied receiving any training during his time at the camp. GE 43 at 1. Finally, during his June 2006 ARB proceedings, the petitioner testified that he had participated in jihad "for a few days" as a youth during the Soviet occupation but that he had received no military training. GE 71 at 6-7. The fact that the petitioner has admitted that he traveled to Afghanistan to train and fight with the mujahideen and that he participated in jihad "for a few days" provides additional corroboration for Rashid's account of the petitioner's background.

---

[18]   The petitioner stated during a [2] interrogation that he twice traveled to Afghanistan to fight jihad, but that he did not train or fight either time. GE 43 at 1. The petitioner provided a different account during a [2] interrogation, in which he stated that he returned to Afghanistan from Pakistan only after the withdrawal of Soviet forces in 1989. GE 20 at 1.



SECRET

The petitioner has offered nothing that persuasively refutes or undercuts the evidence establishing the petitioner's participation in the Afghan mujahideen. Although the petitioner suggests that he was in his teens for most of the Soviet occupation and lacked any formal military training, he has not explained how either fact precludes the possibility that he fought with the Afghan mujahideen or rose through its ranks. Likewise, although the petitioner objects by stating that Rashid has not identified the sources of his information regarding the petitioner's background, the petitioner's own experts have acknowledged that Rashid's reporting is based on his field work in Afghanistan and is highly authoritative. Mar. 31. Tr. at 129; PE 111A ¶ 5. Finally, although Karzai testified that the petitioner had "absolutely no military background," Mar. 31 Tr. at 119, the petitioner has admitted that he traveled to Afghanistan during the Soviet occupation to receive training and has acknowledged that he engaged in jihad for a period of time,[19] GE 71 at 6-7. Accordingly, the weight of the evidence indicates that the petitioner did fight with the Afghan mujahideen against the Soviets.

That the petitioner fought with the Afghan mujahideen, at a time when those forces were allied with the United States and against the Soviet Union, *see* PE 67 at 197, hardly establishes the lawfulness of his detention. This finding does, however, serve as an important starting point for assessing the petitioner's role in the Taliban, for it establishes that the petitioner possessed at least some military experience by the time he joined the Taliban in 1994, and begins to unravel the petitioner's assertion that he was merely a civilian bureaucrat with no connection to the Taliban's military forces.

---

[19]     Karzai's testimony about the petitioner is assessed in greater detail later in the following section. *See infra* Part IV.B.2.b.ii.



SECRET

### b. The Petitioner's Command of Taliban Forces at Mazar-e-Sharif

#### i. The Taliban's Efforts to Capture Mazar-e-Shariff

As previously noted, by 1992, Afghanistan had descended into civil war, as different factions vied for control over the country following the retreat of Soviet forces. By November 1994, Taliban forces had captured Kandahar and by February 1995, had consolidated their control over the Pashtun lands of southern Afghanistan. PE 110 ¶ 11. They then moved west, conquering Afghanistan's western provinces, including Herat. *Id.* In August 1996, the Taliban pushed into Jalalabad and in September, captured Kabul. *Id.* ¶ 12. By the winter of 1996, the Taliban controlled twenty-two of Afghanistan's thirty-four provinces. PE 67 at 54. The only major city not under Taliban control was Mazar-e-Sharif, a city near the northern border with Uzbekistan and the stronghold of anti-Taliban General Rashid Dostum, whose Uzbek forces had insulated the city from the fighting sweeping through the rest of Afghanistan. *Id.* at 54.

In the spring of 1997, the Taliban turned their attention northward. PE 110 ¶ 14. The Taliban quickly swept north from Herat and Kabul, seizing control over several northern provinces. PE 67 at 58. General Dostum fled to Uzbekistan. *Id.* In May 1997, 2,500 heavily-armed Taliban troops under the command of Mullah Abdul Razaq rolled into Mazar-e-Sharif with little resistance.[20] *Id.* Their occupation of the city was short-lived, however, as a counteroffensive by Uzbek and Hazara fighters pushed the Taliban out of the city days later. *Id.* at 58-59.

After regrouping, the Taliban launched a second assault on Mazar-e-Sharif in early September 1997. GE 91 ¶ 3. General Dostum returned from exile and pushed the Taliban out of the Mazar region. PE 67 at 62. Because Mazar-e-Sharif had, by that time, been largely taken

---

[20]   As discussed below, Mullah Razaq preceded the petitioner as the Governor of Herat. *See infra* Part IV.B.2.d.



SECRET

over by Hazara groups, General Dostum based his Uzbek forces in the nearby city of Sheberghan. *Id.* at 63.

In July 1998, the Taliban commenced a third offensive to capture the Mazar region. GE 91 ¶ 4. Taliban forces stationed in the western province of Herat swept towards Mazar-e-Sharif from the west, routing General Dostum's forces in Meymaneh on July 12, 1998, and capturing General Dostum's headquarters in Sheberghan on August 1, 1998. PE 67 at 72-73. These Taliban forces then annihilated the Hazara troops guarding the western road to Mazar-e-Sharif and entered the city on the morning of August 8, 1998. *Id.* at 73.

Rashid writes that once Taliban forces entered Mazar-e-Sharif, "[w]hat followed was another brutal massacre, genocidal in its ferocity, as the Taliban took revenge on their losses the previous year." PE 67 at 73; *see also* GE 8 (Amnesty International News Service 171/98, *Afghanistan: Thousands of Civilians Killed Following Taleban Takeover of Mazar-e Sharif*, Sept. 3, 1998) at 1-2; GE 9 (Dexter Filkins, *Afghans Report Ethnic Massacre by Taliban*, L.A. TIMES, Sept. 18, 1998) at 1. On the first day of the occupation, Taliban forces swept through the city in a "killing frenzy," indiscriminately killing women, children and other civilians. PE 67 at 73; GE 10 (Human Rights Watch Press Release, *Afghanistan: The Massacre in Mazar-I Sharif*, Nov. 1, 1998) at 1. Mullah Abdul Manan Niazi, whom Karzai testified was one of the Taliban commanders who led the offensive on Mazar-e-Sharif, Mar. 31 Tr. at 116, was appointed Governor of Mazar hours after its capture and delivered speeches at mosques throughout the city inciting violence against Hazaras in retaliation for their killing of Taliban soldiers the previous year,[21] PE 67 at 74; GE 12 (The Afghanistan Justice Project, *Casting Shadows: War Crimes and Crimes Against Humanity: 1978-2001* § 7.2 (2005)) at 122. Human Rights Watch stated that

---

[21]     As discussed below, the petitioner was captured at the Pakistani home of Mullah Niazi. *See infra* Part IV.4.



SECRET

"[t]hese speeches, given by the most senior Taliban official in Mazar at the time, clearly indicate that the killings and other attacks on Hazaras were not the actions of renegade Taliban forces but had the sanction of the Taliban authorities." GE 10 at 1.

Over the following days, Niazi implemented a systematic program of ethnic cleansing, overseeing the segregation and massacre of thousands of Hazara residents of Mazar-e-Sharif.[22] GE 11 (Michael Winchester, *Inside Story: Afghanistan Ethnic Cleansing*, ASIAWEEK, Nov. 6, 1998) at 3; PE 67 at 73-74. Rashid estimates that between 6,000 to 8,000 civilians were killed during the Taliban's northern campaign in July and August 1998. PE 67 at 74.

### ii. The Petitioner's Role in the September 1997 Assault on Mazar-e-Sharif

Reliable evidence indicates that the petitioner was a commander of Taliban forces during the Taliban's failed September 1997 assault on Mazar-e-Sharif. One such piece of evidence is a State Department cable dated September 17, 1997, which reports on a discussion held earlier that day between an unidentified U.S. political officer and Tayyab Husseini, a Taliban representative at the Taliban-controlled Afghan embassy in Islamabad. GE 2 at 1. According to the cable, Husseini stated that

> Taliban forces, allied with local Pas[h]tuns, are poised to seize Mazar-i-Sharif city from the Northern Alliance in the "next several days." Smiling broadly, Husseini said Khairullah Khairkhwa[], the Taliban commander in the North and their "Acting Minister of [the] Interior," has been [in] contact with Kandahar and told Taliban authorities there that "Taliban forces are in position to launch a final offensive on the city." However, Khairk[hwa] said he is waiting for reinforcements from Taliban bases in Kunduz and for further uprisings among northern [P]ashtuns living near Mazar-i-Sharif before launching the planned assault.

---

22    Contrary to all injunctions of Islam, which demands immediate burial, Niazi ordered that hundreds of corpses littering the streets be left where they had fallen. PE 11 at 3; GE 11 at 3.



SECRET

GE 2 (State Department FM, (Sept. 17, 1997)) at 1. Husseini also stated that Taliban forces were receiving assistance from "pro-Taliban Hezb-i-Islami elements" attacking the city from the west. *Id.*

Although the State Department cable contains multiple levels of hearsay, it possesses ample indices of reliability. *See id.* As an initial matter, the petitioner has not suggested that the cable inaccurately summarizes Husseini's statements. Indeed, the author of the cable appears to have taken great pains to provide a detailed account of the discussions between Husseini and the U.S. political officer, including what purport to be direct quotations from Husseini. *Id.* at 1-3.

There is also no dispute that Husseini was a political officer and a representative of the Taliban at the time of the September 17, 1997 meeting and that his statements were given voluntarily as part of an official diplomatic exchange between the Taliban and the United States. *See* Petr's Proposed Findings of Fact ¶¶ 37-39. Husseini not only identified the petitioner as a commander of Taliban forces, but also provided a detailed account of the petitioner's activities as a commander, such as his strategic decision to wait for reinforcements before continuing his push towards Mazar-e-Sharif, and expressly identified the source of his account – namely, reports sent from the field by the petitioner to Taliban leaders in Kandahar. GE 2 at 1.

Furthermore, many of the details contained in Husseini's account of the fighting around Mazar-e-Sharif are corroborated by other sources in the record. *See* GE 88 at 103-04 (reporting that Hizb-i-Islami forces assisted in the Taliban September 1997 assault on Mazar-e-Sharif); GE 48 at 229 (noting "heavy fighting again near Mazar" on September 18, 1997). The author of the cable remarks on the plausibility of Husseini's account, noting that "Hussei[n]i's comments are no[t] surprising" and consistent with reports of "continued fighting around Mazar-i-Sharif on September 17." GE 2 at 1, 3.



34

SECRET

Indeed, other than Husseini's identification of the petitioner as a commander of Taliban forces, the petitioner has not challenged any other aspects of Husseini's account of the Taliban's September 1997 assault on Mazar-e-Sharif. Instead, the petitioner speculates that Husseini's account might have been motivated by a desire to "gain political advantage" and argues that this possibility renders his statements wholly unreliable. Petr's Proposed Findings of Fact ¶¶ 38-39. The petitioner, however, has not offered any explanation regarding what political advantage could conceivably have been gained by falsely identifying the petitioner as a commander of the Taliban forces. *See id.* While speculation about Husseini's motivations might call into question the accuracy of his characterizations of the strength of the Taliban's forces and the imminence of their victory, the petitioner has not attempted to explain how the specter of political motivations casts doubt on his identification of the petitioner as a Taliban military commander.

Moreover, Husseini's statements regarding the petitioner's involvement in the September 1997 assault on Mazar-e-Sharif are corroborated by a separate account of that campaign authored by journalist and diplomat Kamal Matinuddin. *See* GE 88 at 1. In *The Taliban Phenomenon*, Matinuddin writes that in September 1997, Taliban forces

> took control of the bypass running towards the river port of Hairatan on the Oxus, thus threatening Mazar-e-Sharif from the rear. Omar had predicted that it would be only a matter of time before the Taliban scored further military victories, and he was not far wrong as, led by Mullah Khairullah Khairkhwa, they entered Mazar-e-Sharif a day later with the support of Majeed Bacha, Bashir Khan, and Jumma Khan Hamdar, all of whom belonged to the Hikmetyar faction of Hizb-e-Islami.

GE 88 at 103-04.

Although the petitioner suggests that Matinuddin's account does not independently corroborate the State Department cable because Matinuddin may have relied on the same source cited in the State Department cable, the petitioner has offered nothing to substantiate that theory.



SECRET

*See* GE 88 at 103-04; GE 2 at 1. In fact, although Matinuddin and Husseini both identify the petitioner as a commander of Taliban forces and note that Hizb-i-Islami fighters participated in the assault, the two accounts otherwise possess few overlapping details. *Compare* GE 88 at 104 (identifying the specific Hizb-i-Islami leaders who participated in the Taliban's September 1997 assault, a detail not included in the State Department cable) *with* GE 2 at 1 (providing information about tactical decisions and the locations of forces involved in the assault, details not present in Matinuddin's account).

The reliability of Matinuddin's account is further supported by the fact that the author is an experienced military officer, diplomat[23] and journalist who has edited and written numerous works on Afghanistan. GE 88 at 1. Although the petitioner complains that Matinuddin lacked firsthand knowledge of the events at issue and does not identify the sources on which he based his account, the petitioner's own subject matter expert lists Matinuddin's *The Taliban Phenomenon* as one of the most significant "major scholarly works" on the rise of the Taliban.[24] PE 111A ¶ 5. Indeed, the petitioner can only point to minor purported inconsistencies between Matinuddin's account and Rashid's account of the Taliban's September 1997 offensive,[25] and does not challenge any core aspect of Matinuddin's reporting, other than his identification of the

---

[23] Matinuddin represented Pakistan in several diplomatic capacities, including as its ambassador to Thailand. GE 88 at 1.

[24] In fact, Williams's insistence that the petitioner could not have served as a Taliban commander during any of the assaults on Mazar-e-Sharif stems from his erroneous belief that the petitioner is not mentioned as a military commander in any these "major scholarly works." PE 111 ¶ 9 ("Simply put, had there been a Mullah Khairkhwa leading troops on the northern front from 1997 to 1998[,] one of these scholars . . . would have recorded his name somewhere.").

[25] The petitioner notes that according to Matinuddin, the Taliban captured the town of Tashkurgan on September 9, 1997, GE 88 at 103-04, while Rashid reports that the Taliban captured the same town on September 7, 1997, PE 67 at 62. This minor inconsistency does not, in the court's view, significantly undermine the reliability of either account. Indeed, Matinuddin's and Rashid's accounts of the September 1997 assault on Mazar-e-Sharif are highly consistent with one another. *See* GE 88 at 103-04; PE 67 at 62-63, 229.



SECRET

SECRET

petitioner as a commander of Taliban forces. Based on these considerations, the court concludes that Matinuddin's and Husseini's highly consistent accounts of the September 1997 assault on Mazar-e-Sharif are accurate and reliable evidence of the petitioner's role as a Taliban commander.

Furthermore, as discussed below, the petitioner's role as a commander of Taliban forces in September 1997 is also corroborated by the statements of a former senior officer in the Afghan mujahideen, who expressly identified the petitioner as a former Taliban military commander. GE 22 at 1; *infra* Part IV.B.2.b.iii. The court also notes that the petitioner's role as a commander of Taliban forces in September 1997 is consistent with the fact that he possessed military experience from his participation in the Afghan jihad, *see supra* Part IV.B.2.a, as well as the evidence indicating that the petitioner participated in the August 1998 assault on Mazar-e-Sharif, *see infra* Part IV.B.2.b.iii. Thus, the weight of the evidence supports the conclusion that the petitioner was a military commander who led Taliban forces during the Taliban's assault on Mazar-e-Sharif in September 1997.

### iii. The Petitioner's Role in the August 1998 Conquest of Mazar-e-Sharif

Numerous sources have also reported that after the Taliban's failed September 1997 assault on Mazar-e-Sharif, the petitioner remained a military commander, directing Taliban fighters during the Taliban's northern offensive in the summer of 1998. One of the earliest of these sources is an article published by a western media outlet on July 13, 1998, which reported on the Taliban's fresh bid to seize the northern territories remaining outside their control. GE 4 (Stefan Smith, *Taliban Make Major Advance in Northern Afghanistan*, AGENCE FRANCE PRESSE, July 13, 1998) at 1. The article, which draws from a wide-variety of sources, including western aid workers, Taliban officials and Radio Shariat (the Taliban-run radio station), reported that the



SECRET

Taliban had captured Meymaneh, a city to the southwest of Mazar-e-Sharif, and that this victory yielded the Taliban 100 enemy tanks and 800 enemy fighters. *Id.* at 1-2. The article further reported that Taliban forces were poised to push northward toward the cities of Sherberghan and Mazar-e-Sharif. *Id.* According the article, "Taliban officials were tight-lipped over the militia's plans, and said the student movement was busy consolidating their positions, with *battle-veteran* and interior minister Mullah Khairullah Khairkhwa heading the operation." *Id.* at 2 (emphasis added).

This July 13, 1998 report is consistent with Rashid's account that on July 12, 1998, Taliban forces captured Meymaneh and seized "100 tanks and vehicles and some 800 Uzbek soldiers." GE 48 at 72. The report is also consistent with a July 12, 1998 news report stating that Taliban soldiers had conquered the city of Meymaneh and that Mullah Omar had appointed "(Interior minister) Mullah Khairullah Khairkhwa to oversee the captured areas and to ensure the hundreds of prisoners taken are well treated."[26] GE 3 (*Taleban Claim Sweep of Afghanistan's Faryab Province*, HONG KONG AGENCE FRANCE PRESSE, July 12, 1998) at 2. Although the latter report does not expressly state that the petitioner was a Taliban commander, it corroborates that the petitioner was at Meymaneh at the time of the Taliban conquest of that city and that Mullah Omar had placed the petitioner in a position of leadership during the summer 1998 northern offensive. *Id.*

The July 13, 1998 report identifying the petitioner as a Taliban commander at Meymaneh is also corroborated by media accounts reporting on the Taliban's subsequent push from Meymaneh to Mazar-e-Sharif. On August 3, 1998, *Agence France Presse* reported that Taliban forces advancing on Mazar-e-Sharif from the west had captured the city of Sheberghan, the

---

[26]      Rashid reports that the majority of Uzbek soldiers captured following the battle for Meymaneh were massacred by the Taliban. GE 48 at 72.



SECRET

stronghold of General Dostum lying between Meymaneh and Mazar-e-Sharif. GE 5 (*Taliban Open Second Front in Battle for North Afghanistan*, HONG KONG AGENCE FRANCE PRESSE, Aug. 3, 1998) at 1; *see also* GE 48 at 72, 261 (reporting that Taliban forces conquered Sheberghan on August 1, 1998). The August 3, 1998 report cited military sources who stated that the assault on Sheberghan had been launched from Meymaneh, which provided "an invaluable staging and supply post for the latest attack." GE 5 at 2; *see also* GE 4 at 2 (reporting that in mid-July, the petitioner was in Meymaneh consolidating his forces in preparation for a push toward Mazar-e-Sharif). The report further stated that this assault was "led by interior minister Mullah Khairullah Khairkhwa." GE 5 at 2.

These accounts find further corroboration in an August 5, 1998 radio report from the Moscow Radio Rossii Network, a media outlet with correspondents stationed in the region. GE 6 (*Moscow Reports Anti-Taleban Counter-Offensive Under Way*, MOSCOW RADIO ROSSII NETWORK, Aug. 5, 1998) at 1-2. The radio report explained that Taliban forces were advancing towards Mazar-e-Sharif from the city of Sheberghan to the west. *Id.* at 1. The report further stated that

> Khairollah Khairkhwa, interior minister in the Taleban administration, who was advancing toward the town from the west, has halted his troops' advance. He has ordered that the weapons abandoned in large quantities by the alliance soldiers should be collected and the local population disarmed. Explaining his order, Khairkhwa said: We must assure ourselves of a reliable and calm rear.

*Id.*

The court notes that the actions attributed to the petitioner in this radio report are highly consistent with the descriptions of the petitioner's actions in both the previously-discussed State Department cable and the July 13, 1998 report. *See* GE 2 at 1; GE 4 at 1. In each of these instances, the petitioner is credited with choosing to make strategic delays in his advance

SECRET

SECRET

towards Mazar-e-Sharif. *See* GE 6 at 1; GE 2 at 1; GE 4 at 1. The statements attributed to the

petitioner in the radio report are also consistent with the petitioner's testimony before the ARB,

during which he acknowledged overseeing the Taliban's efforts to disarm the citizens of northern

Afghanistan during the Taliban's northern offensive.[27] GE 71 at 7.

Moreover, these accounts of the petitioner's role in the capture of Meymaneh and

Sheberghan are consistent with and corroborated by yet another report regarding the Taliban's

conquest of Mazar-e-Sharif on August 8, 1998. On November 6, 1998, *Asiaweek*, a western

news magazine, published an article entitled, "Inside Story: Afghanistan Ethnic Cleansing." GE

11 at 1. Drawing on a variety of sources, including interviews with eyewitnesses, the article

described the systematic massacre of the Shiite population of Mazar-e-Sharif following the

Taliban's conquest of that city. *See generally id.* The article specifically noted that "laurels for

the conquest of Aug. 8 went to Khairullah Khairkhwah, a Taliban mullah who when not busy

making war doubles as the regime's 'interior minister.'" *Id.* at 3.

Although the petitioner contends that the author of the *Asiaweek* article does not specify

the sources on which he based his reporting, the article expressly states that the account is drawn

from "interviews with survivors . . . and documents obtained from international aid

organizations." *Id.* at 1. Furthermore, the only aspect of the *Asiaweek* article that the petitioner

has challenged is the portion of the article stating that the petitioner received credit for the

conquest of Mazar-e-Sharif. Indeed, counsel for the petitioner acknowledged that this article

was a "fairly reliable document." Mar. 28 Tr. at 81, 92. Finally, the *Asiaweek* account is

consistent with the overall narrative set forth in the different news reports discussed to this point,

---

[27]     Even if the court were to credit the petitioner's assertion that his role in the Taliban's northern
offensive was limited to disarming the local populations conquered by Taliban forces, *see* GE 3
at 2; GE 71 at 4, this fact would demonstrate that the petitioner was entrusted with significant
military-support responsibilities during a time of ongoing conflict and undermine the petitioner's
contention that he was merely a civilian bureaucrat with no involvement in any military matters.



~~SECRET~~

which document the petitioner's role as a commander of Taliban forces that advanced toward Mazar-e-Sharif from the west, conquering the cities of Meymaneh and Sheberghan along the way, and entered the city on August 8, 1998. *Id.*

The petitioner contends that these media reports are unreliable because they rely on information disseminated by Radio Shariat, a Taliban-controlled radio station. According to Karzai, Radio Shariat was merely a mouthpiece for the Taliban government that "did nothing but distribute propaganda." Mar. 31 Tr. at 152. The purpose of Radio Shariat reports "was mostly to boost the morale of [Taliban] foot soldiers, mostly to tell individuals that we're going to go prepare to take over the area." *Id.* at 117. Because Radio Shariat is not a reliable source of information, the petitioner argues, all of the articles reporting on the petitioner's role in the Taliban's northern offensive of 1998 are also unreliable.

The petitioner's arguments are unpersuasive. As an initial matter, not every media report discussed above relied on information provided by Radio Shariat. The portion of the July 13, 1998 article describing the petitioner's role as the head of forces at Meymaneh appears to have been based on the reporter's conversations with Taliban officials identified in the article, such as Mawlawi Abdurrahman and Mullah Abdul Haj. GE 4 at 1-2. Likewise, there is nothing to indicate that the Moscow Radio Rossii report or the *Asiaweek* article relied on Radio Shariat reports. *See generally* GE 6; GE 11.

More fundamentally, even if the principal purpose of Radio Shariat was to distribute propaganda to boost the morale of Taliban troops, the petitioner has offered no explanation for why the Taliban would have repeatedly and deliberately misidentified him as a commander of the Taliban offensive. The petitioner's theory – that all of these reports were disseminated as part of a prolonged conspiracy to falsely identify a civilian bureaucrat with no military

~~UNCLASSIFIED~~

41

SECRET

experience as a leader of Taliban forces to boost the morale of fighters – is too farfetched, speculative and unexplained to be credited by the court.

The petitioner also conjectures that once he was falsely identified as a military commander in one article, this label was picked up and repeated in subsequent news reports without independent corroboration or verification. This theory, however, is not supported by the record. The articles discussed above report on the petitioner's activities at particular points during the summer 1998 offensive. GE 4 at 2; GE 5 at 2; GE 6 at 1; GE 11 at 4. The petitioner does not explain how, for instance, his reported decision to halt his troops' advance to collect weapons from the local populations, GE 6 at 1, could have been propagated from a report that weeks before, he had been consolidating Taliban forces at Meymaneh, GE 4 at 2. Likewise, there is no evidence that the *Asiaweek* article reporting that the petitioner received "laurels" for the capture of Mazar-e-Sharif was based on any of the previously discussed articles, which all predate the August 8, 1998 conquest of Mazar-e-Sharif. *See generally* GE 3, 4, 5, 6.

Finally, the court notes that all of these media accounts of the petitioner's role as a Taliban commander during the summer 1998 northern offensive – as well as the reports of the petitioner's role as a Taliban commander in September 1997 – are corroborated by the statements of a former Afghan mujahideen commander, Mohammad Akhtiar (ISN 1036). *See* GE 22 (ISN 1036 SIR (Dec. 27, 2005)) at 1-2. Akhtiar was a former colonel or lieutenant colonel in the Afghan mujahideen during the Soviet occupation. *Id.* at 1. When asked by GTMO interrogators whether he knew of any other detainees with ties to the Taliban or al-Qaida, one of the individuals that Akhtiar identified was the petitioner. *Id.* After noting that the petitioner had been the Taliban Governor of Herat, Akhtiar stated that "Khirullah once held the position of



SECRET

division commander, commander of a military corps, was the Governor of Mazar-e-Sharif and in particular was a sub-commander/trusted person of Mullah Omar." *Id.*

The petitioner does not dispute the government's contention that Akhtiar was a senior officer within the Afghan mujahideen and was in a position to know the structure of the Taliban's armed forces. Nor is there any evidence that Akhtiar was coerced into making his statements about the petitioner; to the contrary, the interrogation report states that "the direct approach orchestrated with the pride and ego up (proper military protocol) and love of country were and have been the approaches used" by interrogators to elicit information from Akhtiar. *Id.* The interrogation report notes that Akhtiar had been deemed truthful and cooperative. *Id.*

Although Akhtiar incorrectly identified the petitioner as the "Governor of Mazar-e-Sharif," *id.* at 1, this statement does not dramatically alter the court's assessment of Akhtiar's reliability, as it is undisputed that the petitioner possessed administrative authority over territories captured during the Taliban's northern offensive in the summer of 1998, including Mazar-e-Sharif. *See, e.g.*, PE 36, Att. B at 1 (interview statement of former Taliban official Abdul Salam Rocketi, in which Rocketi states that the petitioner traveled to Mazar-e-Sharif after the Taliban's conquest of the city to assist in administrative matters); PE 70 at 3 (petitioner's ARB testimony acknowledging that he went to Mazar-e-Sharif to assist the Taliban forces that captured the city); GE 15 (*Taleban in North Tell UN Human Rights Guaranteed*, MAZAR-E SHARIF VOICE OF SHARI'AH RADIO, Aug. 8, 1998) at 1 (reporting that "[t]he acting minister of internal affairs and coordinator of the northern provinces, esteemed Mowlawi Khayrollah Khairkhwa, met a delegation of the UN Commission for Human Rights"). The petitioner also attacks the reliability of Akhtiar's statements by noting that the interrogation report indicates that Akhtiar was to be shown a picture of the petitioner at his next interrogation, GE 22 at 2, but there



SECRET

is no indication that such an identification ever took place. Yet Akhtiar stated during the interrogation that his statements concerned "the Herat province Taliban Governor," *id.* at 1, and there is no dispute that the petitioner was the Governor of Herat, GE 91 ¶ 17. Thus, there is no uncertainty that Akhtiar was referring to the petitioner in his statements.

In assessing the reliability of Akhtiar's statements, the court has considered the fact that Akhtiar does not expressly identify the source of his information about the petitioner, does not provide detailed allegations about the petitioner, *see* GE 22 at 1, and had requested psychological treatment around the time he made these statements, PE 72 (medical records for ISN 1036) at 1-4. Nonetheless, in light of the corroboration between Akhtiar's statements and the media reports addressing the petitioner's role as a Taliban commander, the classified State Department cable reporting on the petitioner's role as a military commander, the interrogator's assessments of Akhtiar's truthfulness and the lack of any evidence of undue coercion, the court concludes that Akhtiar's statements are sufficiently reliable and provide additional support for the government's allegation that the petitioner served as a Taliban military commander.

To rebut this evidence, the petitioner relies heavily on a March 2002 interrogation report in which the interrogator credits the petitioner's claim that he was never a military commander. PE 25 (ISN 579 SIR (Mar. 14, 2002)) at 1. The court notes that the interrogator's conclusions regarding the petitioner appear to have been influenced in significant part by his assessment of the petitioner's demeanor – namely, that the petitioner [1]

[1] exhibited no signs of deception. *See id.* This assessment was not, however, shared by other interrogators who questioned the petitioner.



SECRET

44

~~SECRET~~

PE 34 (ISN 579 SIR (Mar. 30, 2002)) at 1 (interrogation report stating that the petitioner █████████████ ████████████████████████████████████ noting that when the petitioner answers a question, "it will be minimal at best and require extensive follow up"). Furthermore, although the interrogation report states that unidentified "local sources" corroborate the petitioner's claim that he was not a military commander at any battle for Mazar-e-Sharif, PE 25 at 1-2, as previously discussed, the petitioner has been identified as such a commander in a variety of sources, including a classified State Department cable, a publication that the petitioner's expert has described as a major scholarly work, the statements of a senior Afghan mujahideen commander and in numerous contemporaneous media reports. In the court's view, this single interrogation report does not, by itself or in conjunction with the other evidence offered by the petitioner, outweigh the evidence establishing the petitioner's role as a military commander.

The petitioner also relies on statements by two former Taliban officials, Mullah Abdul Salam Rocketi[28] and Wakil Akhmad Motawakil,[29] to support his contention that he was never a military leader. In interviews given to the petitioner's investigator, both men stated that the petitioner was a civilian administrator and not a military commander. *See generally* PE 36, Att.

---

[28] Rocketi is a former Taliban military commander who led Taliban forces during the U.S.-led invasion of Afghanistan. GE 27 (IIR 6 931 0020 02) at 2; PE 43, Att. B (transcript of interview with Rocketi) at 4. He has since reconciled with the current Afghan government and is now a member of the Afghan parliament. Mar. 31 Tr. at 109.

[29] Motawakil was formerly an executive assistant to Mullah Omar, who later appointed him to serve as the Taliban's Foreign Minister. *Id.* at 108; PE 36, Att. B (transcript of interview with Motawakil) at 1. After being arrested and spending three years in Bagram prison, Motawakil was released and currently works with Karzai's Centre for Conflict and Peace Studies. Mar. 31 Tr. at 108.

45

SECRET

B; PE 43, Att. B. Rocketi stated that although the petitioner was in Mazar-e-Sharif in the summer of 1998, he traveled there "on a civil duty" and "not as part of the military team when Taliban [forces] took over the city." PE 36, Att. B at 1. Likewise, Motawakil stated that the petitioner was not a military official and had always worked as a civilian administrator. PE 43, Att. B at 4.

In the court's view, these statements do not, standing alone or in conjunction with the other evidence offered by the petitioner, overcome the weight of the evidence establishing the petitioner's military role. Unlike the news reports, scholarly works and other sources previously discussed, Rocketi and Motawakil provided their statements on the petitioner's behalf expressly for use in this litigation. *See generally* PE 36; PE 43. Karzai himself indicated that Rocketi had a close relationship with the petitioner, having served as a corps commander in Herat during the petitioner's tenure as the Governor of Herat. Mar. 31 Tr. at 87 (counting Rocketi among the individuals who had "daily and regular contacts with Mullah Khairkhwa"). Similarly, Karzai testified that Motawakil is "extremely interested in detainee affairs" and works with Karzai's Centre for Conflict and Peace Studies, which has acknowledged that it has an interest in seeking the petitioner's release. *See* Mar. 31 Tr. at 125.

The court also notes that Rocketi and Motawakil provide only broad statements about the petitioner's role within the Taliban and do not specify the bases for their assertions about the petitioner's activities in Mazar-e-Sharif. *See* PE 36, Att. B at 1-2; PE 43, Att. B at 4-6. These statements stand in stark contrast to the detailed accounts contained in the State Department cable and the media reports addressing the petitioner's role as a military commander, which contain contemporaneous accounts of the petitioner's activities created long before the



petitioner's apprehension and years before the commencement of this litigation. *See generally*
GE 2-6, 11, 88.

Similar considerations limit the weight that the court affords Karzai's testimony
regarding the petitioner's roles within the Taliban. Although Karzai testified that the petitioner
was never a Taliban military commander, Mar. 31 Tr. at 115, 119, his testimony does not
independently corroborate the statements of Rocketi and Motawakil, as Karzai acknowledged
that he based his conclusions about the petitioner primarily on conversations he had with
individuals associated with the petitioner, *id.* at 85-88, including Rocketi, *id.* at 87, and,
presumably, Motawakil, *id.* at 88, 109. Furthermore, Karzai candidly acknowledged that he and
his organization, which is devoted to furthering the peace and stability of Afghanistan, have an
independent desire to see the petitioner released, testifying that

> Mullah Khairkhwa is one of the individuals who has quite a lot of respect within
> the Taliban and from so many different communities. His release could have a
> significant impact on the peace process that exists in Afghanistan, particularly in
> terms of national security and particularly in terms of what he can bring to the
> table. Many of the senior people still hold him in very high esteem, in high
> regards, so releasing him would make a very serious statement not only in terms
> of the peace process but also about what the United States represents.

Mar. 31 Tr. at 125.

Thus, Karzai's comments about the petitioner appear to have been motivated by policy
considerations unrelated to the evidence at issue here. Although there can be no doubt about the
nobility and importance of the cause championed by Karzai and his organization, considerations
about the wisdom and utility of releasing the petitioner, which motivated Karzai's testimony, are
matters for the political branches beyond the purview of this court. *See supra* Part IV.A.

Additional considerations also lead the court to question Karzai's conclusions about the
petitioner. For instance, Karzai testified that the petitioner could not have been a military

SECRET

commander during the conquest of Mazar-e-Sharif because Taliban forces were led by Mullah Faisel, chief of the army for the Taliban, and later by Mullah Dadullah and Mullah Niazi. Mar. 31 Tr. at 115-16. Yet according to Karzai, the Taliban assault on Mazar-e-Sharif involved tens of thousands of soldiers, *id.* at 119, a fact that would suggest that the Taliban must have had multiple commanders leading its forces, *see, e.g.*, GE 48 at 100-01 (listing various Taliban officials who acted as commanders during the assaults on Mazar-e-Sharif). The fact that the petitioner was not the only or most senior Taliban commander involved in the operation does not mean that he could not have led Taliban fighters during these engagements.

Karzai also testified that the petitioner could not have served as a commander during the conquest of Mazar-e-Sharif "because he has absolutely no military background, never fought in a battle, [and] was religiously educated." Mar. 31 Tr. at 119. Yet, as previously discussed, the petitioner did possess prior military experience, having fought with the Afghan mujahideen during the Soviet occupation. *See supra* Part IV.B.2.a. Furthermore, the fact that the petitioner was "religiously educated" provides little support for Karzai's conclusion; as previously discussed, most of the senior leaders of the Taliban, including Mullah Omar, had received religious education in madrassas, *see* GE 48 at 252-55; GE 88 at 21, and, as Karzai himself acknowledged in his declaration, most of the Taliban's foot soldiers were recruited from radical madrassas, PE 110 ¶ 9.

Finally, the court notes that the statements of Karzai, Rocketi and Motawakil all appear to draw on the presumption that there existed within the Taliban a strict division between military and civilian personnel. *See* Mar. 31 Tr. at 118-19 (Karzai's testimony that military and civilian responsibilities were distinct); *id.* at 149 (Karzai's testimony that there was no overlap between civilian and military chains of command); PE 36, Att. B at 1 (Rocketi's testimony that the



SECRET

petitioner "was a civilian person, not a military commander"); PE 43, Att. B at 5 (Motawakil's

statement that "[w]e have a structure in Afghanistan that military belongs to Ministry of Defense.

But [the petitioner] was the interior minister, governor, a spokesman.").

This presumption, however, contradicts the weight of the evidence regarding the structure

of the Taliban government. For instance, one scholar notes that

> [o]ne of the most remarkable characteristics of the Taliban leadership is that top
> government officials often switch from the battlefield to the ministry and back
> again, each time following the orders from Mullah Omar. In one sense, this
> produces remarkable flexibility among the Taliban hierarchy as they all act as
> both administrators and military commanders.

GE 47 (Nasreen Ghufran, *The Taliban and the Civil War Entanglement in Afghanistan*, 41

ASIAN SURV., no. 3, at 462) at 474.

This observation is echoed by Rashid, who writes:

> Several members of the military Shura are also acting ministers, creating even
> greater chaos in the Kabul administration. Thus Mullah Mohammed Abbas, the
> Health Minister, was the second-in-command of the Taliban expeditionary force
> trapped in the north after the 1997 Mazar defeat. He was then pulled out and sent
> to Herat to organize another offensive and finally returned to his job as Minister
> six months later . . . . Mullah Ehsanullah Ehsan, the Governor of the State
> Bank[,] commanded an elite force of some 1,000 Kandaharis, ensuring his
> financial job received little attention before he was killed in Mazar in 1997.
> Mullah Abdul Razaq, Governor of Herat, who was captured in Mazar in 1997
> and later freed, has been leading military offensives all over the country since
> 1994. Almost all of the members of the Kandahar and Kabul Shura, except for
> those with physical disabilities, have acted as military commanders at some time
> or the other.

GE 48 at 100-01; *see also* GE 88 at 100 (listing Taliban ministers captured during the Northern

Alliance's May 1997 counteroffensive in Mazar-e-Sharif); GE 5 at 2 (reporting that in early

August 1998, Taliban troops "led by information and culture minister and hardened fighter

Mullah Amir Khan Muttaqi – had broken through a frontline around 100 kilometers (62 miles)

east of Mazar-i-Sharif and were continuing their advance").



SECRET

These sources indicate that senior Taliban officials possessed both military and civilian responsibilities and that many Taliban officials with civilian titles functioned as military commanders during the Taliban's various assaults on Mazar-e-Sharif. *See* GE 5 at 2; GE 48 at 100-01. The court credits these reports, which identify specific Taliban leaders who functioned as dual military and civilian officials, over the broad assertions of Karzai, Rocketi and Motawakil, and finds that they provide additional support for the conclusion that the petitioner possessed military responsibilities while he held the post of Acting Interior Minster. *See* GE 11 at 3 ("Laurels for the conquest of Aug. 8 went to Khairullah Khairkhwah, a Taliban mullah who when not busy making war doubles as the regime's 'interior minister.'").

### iv. Summary of the Evidence Regarding the Petitioner's Role at Mazar-e-Sharif

In summary, the weight of the evidence supports the government's contention that the petitioner served as a military commander during the Taliban's assaults on Mazar-e-Sharif in September 1997 and the summer of 1998. It is far from clear that these findings, standing alone, would establish the lawfulness of the petitioner's detention. Nonetheless, together with the evidence of the petitioner's involvement with the Afghan mujahideen, *see supra* Part IV.B.2.a, and the petitioner's membership on the Taliban's Supreme Shura, *see infra* Part IV.B.2.c, they undermine the petitioner's claim that he was merely a civilian official shielded from the Taliban's military affairs and support the notion, as elaborated in the following sections, that the petitioner remained integrally involved in the Taliban's military forces before and after the U.S.-led invasion of Afghanistan.

### c. The Petitioner's Position on the Taliban's Supreme Shura

As the Taliban rose to power, they instituted a ruling structure organized in three governmental levels. PE 110 ¶ 19. At the top of the structure was the Amir ul-Muminin (the



SECRET

Commander of the Faithful), Mullah Omar. *Id.* Below Mullah Omar was the ten-member Supreme Shura, which was based in Kandahar, reported directly to Mullah Omar and, according to Karzai, was "[t]he highest decision making body of the Taliban." *Id.*; *accord* GE 48 at 250. Subordinate to the Supreme Shura were two sub-councils, the Military Shura and the Kabul Shura. PE 110 ¶¶ 19, 21.

Ample evidence establishes that the petitioner served as a member of the Taliban's Supreme Shura. GE 48 at 250; GE 88 at 44; Mar. 31 Tr. at 135. It is equally clear that the Supreme Shura possessed authority over military matters. Karzai noted that the Military Shura, a body "in charge of devising strategies and implementing tactical decisions," reported to the Supreme Shura. PE 110 ¶ 21. The Kabul Shura, whose responsibilities included "the Kabul front against the Northern Alliance," also reported to the Supreme Shura. *Id.* ¶ 22 (noting that "[i]mportant issues" faced by the Kabul Shura "were conveyed to the Supreme Shura for decisions to be made"). Indeed, Karzai stated that "[i]n addition to the 10 permanent members, [Supreme] Shura meetings also involved military commanders, tribal leaders" and others. *Id.* ¶ 20.

The petitioner notes that after 1996, governmental power was concentrated in the hands of Mullah Omar, who held ultimate decision-making authority over all matters. GE 48 at 102; PE 110 ¶ 18. Nonetheless, even after the Supreme Shura's decision-making authority waned, it continued to have a "consultative function." PE 110 ¶ 18. It is therefore unsurprising that, according to Rashid, "[a]lmost all of the members of the Kandahar and Kabul Shura, except for those with physical disabilities, have acted as military commanders at some time or the other." GE 48 at 100-01.


SECRET

SECRET

The fact that the petitioner was appointed to serve on the Supreme Shura, which reported directly to Mullah Omar, possessed responsibility over military matters and was comprised almost exclusively of military commanders, cuts against the petitioner's assertion that he was a civilian bureaucrat sequestered from the Taliban's military matters. The petitioner's membership in the Supreme Shura is also consistent with the evidence that the petitioner obtained military experience with the Afghan mujahideen, led Taliban forces during the Taliban's northern offensives in 1997 and 1998 and, as discussed below, continued to wield military responsibilities through the U.S.-led invasion of Afghanistan.

### d. The Petitioner's Military Responsibilities as Governor of Herat Leading Up to Operation Enduring Freedom

On October 27, 1999, Mullah Omar appointed the petitioner to serve as Governor of Herat, a post that he held at the time of the U.S.-led invasion in October 2001. GE 91 ¶ 17; GE 43 at 2. The petitioner has stated that as Governor of Herat, he was a mere civilian administrator, collecting taxes, distributing revenues to the Taliban's Minister of Finance and resolving local disputes, GE 71 at 5; PE 12 (ISN 579 MFR (May 30, 2002)) at 1, and maintains that he had no involvement with any military matters, GE 70 at 2; PE 12 at 1.

The evidence does not support the petitioner's assertions. The court notes that in a recent statement on its "successful administrative policy," describing the structure, positions and policies of a prospective Taliban government, the Taliban explained that each province of Afghanistan "is an independent unit with a commander called the Governor" who is "directly responsible for the Supreme Command of that province and directs its military, civilian, financial and legal affairs." *See* GE 49 (Ikram Maiwandi, *The Islamic Emirate of Afghanistan and Its Successful Administrative Policy*, AL-SOMOOD MAGAZINE, Jan. 27, 2011) at 2. Thus, under the



SECRET

Taliban's model for governance, the governor of a province serves as its highest civilian and military authority. *See id.*

This governance model is consistent with the fact that nearly all senior Taliban leaders held both civilian and military positions, *see, e.g.*, GE 48 at 100-01, as well as the fact that the individual who preceded the petitioner as Governor of Herat, Mullah Abdul Razaq, was a senior military commander who was captured at Mazar-e-Sharif in 1997 and, after his release, led military offensives all over the country, GE 48 at 100; GE 88 at 100. The facts support the notion that the petitioner had both military and civilian responsibilities as the Governor of Herat.

Indeed, since his capture by Pakistani authorities in early 2002, the petitioner has displayed a level of detailed knowledge about military installations in Herat that would suggest he was no mere tax collector. For example, during one interrogation, the petitioner stated that

> the Taliban's 2 largest divisions were located in the region of Herat. One of the divisions w[as] located in 4-5 km East of the Governors Office Building in Herat. This division consisted mainly of equipment that was left behind by the Russians. Approx. 30-40 tanks, (some not operational), all types of artillery, weaponry, "lots" of shoulder rockets displayed on the tarmac[] for everyone to see how strong the Taliban was.

GE 46 (ISN 579 MFR (Sept. 25, 2003)) at 1.

According to the petitioner, this division possessed three jets, one cargo plane and two helicopters and was commanded by Abdul Salam Rocketi. *Id.* at 1-2. The petitioner also stated that the other Taliban division was located at the Sheendand Airbase and was commanded by Peer Aagha. *Id.* at 2. The petitioner explained that "this division had the same type of equipment as the first division . . . and would not go into great detail other than saying the Sheendand Division had an airstrip." *Id.* The petitioner further noted that "the Taliban Divisions are not the same as the way we (U.S. Army) have our division set-up/established" and that all of the trainers for these divisions were Taliban commanders who had served in previous wars. *Id.*



~~SECRET~~

In other interrogations, the petitioner has described the following military facilities

located in Herat:

- Qoli Urdu: The petitioner has described Qoli Urdu as "a large, run-down installation, north of Herat." GE 43 at 2; *see also* GE 45 at 1 (interrogation report in which the petitioner describes Qoli Urdu as "a very big military installation just north of Herat"). The petitioner has explained that his deputy, Abdul Hanan, renovated part of this facility with funding from Mullah Omar. PE 30 (IIR 6 034 0898 02) at 4.

- Ferqa: The petitioner has reported that east of Qoli Urdu was a military facility called Ferqa. GE 43 at 2. ████████████████████████

- Qoai Char ("Force 4"): The petitioner stated that "an installation called Force 4 had 30 to 40 operational, Soviet-era tanks and 100 broken tanks. Force 4 is located west of Herat towards the Iranian border." GE 43 at 2; *see also* GE 45 at 1 (interrogation report in which the petitioner identified "Qoai #4 . . . in the western part of Herat province, close to the Iranian border with about 30-40 tanks stationed there").



- ████████████████████████████████████

The petitioner also possessed detailed knowledge about the locations of weapons caches

and the capabilities of different missile systems. For instance, in an interrogation report dated

May 26, 2002, the petitioner provided a thorough account of the acquisition, maintenance,

locations and capabilities of the Taliban's Stinger missile inventory:

> From 1996 to 2001, [Mullah] Ghazi handled the Taliban's inventory of Stinger Missiles due to his prior training and knowledge of the missiles. When a Stinger Missile was found in [Afghanistan], Ghazi was responsible for verifying its authenticity and serviceability first and then its storage and delivery to field units. Khairkhwa advised [that] the Stinger Missiles were originally stored at a prior residence of Mullah Omar's in Kandahar . . . . [In 2000], Omar . . . moved himself and the Stingers to an undisclosed location in Philco, on the outskirts of Kandahar. To Khairkhwa's knowledge, no new Stingers have been brought into [Afghanistan]. All were left over from the time of Jihad (Soviet invasion). Once



SECRET

the Taliban put the word out, people who possessed or found Stingers would either give or sell the[m] to the Taliban. In other instances, they were taken by force.

The Taliban did not use the Stingers against U.S. or Allied war planes. Allied aircraft flew too high and the Taliban figured since they were U.S. made, U.S. planes would have appropriate countermeasures for them. Although the Stingers were prized, the Taliban had no interest in Soviet made SA-7's or "blue pipes" as they were called. They were considered useless.

GE 44 at 3-4; *see also* GE 60 (ISN 579 FD-302 (June 2, 2002)) at 3 (interrogator's comment that

"Khairkhwa had previously denigrated old Soviet-made shoulder fired missiles known as 'blue

pipes'").



The petitioner has failed to explain why a civilian bureaucrat, whose responsibilities were

limited to collecting taxes and resolving civil disputes, would possess such detailed and sensitive

knowledge about the locations of military installations, weapons caches and the Taliban's view

of the effectiveness of different missile systems. Rather, this knowledge, coupled with the

petitioner's detailed knowledge about the locations, personnel and weapons of various military

bases in Herat and the fact that the petitioner's predecessor was a seasoned military commander,

support the notion that Taliban provincial governors like the petitioner possessed authority over

both military and civilian matters related to their district.



SECRET

The evidence also indicates that the petitioner's purportedly civilian duties – in particular, the disbursement of Taliban funds – had, at least on occasion, a direct nexus to Taliban military and security activities.

The court's ability to assess the reliability this report is hindered by the report's failure to expressly identify its source. *See, e.g., Khan*, 646 F. Supp. 2d at 11-15 (observing that the court could not make reliability determinations for documents for which the government had not identified the source of the information); PE 74 (Decl. of Paul Pillar) ¶ 21 (noting the difficulty of assessing the reliability of information whose source is unknown). Despite this significant obstacle, both intrinsic and exogenous factors persuade the court to credit the information contained in the report. *See Barhoumi*, 609 F.3d at 429; *Bensayah*, 610 F.3d at 726.

~~SECRET~~

Moreover, the information in the report is highly consistent with the petitioner's own statements – namely, that his responsibilities as Governor of Herat included disbursing funds and implementing orders from the Taliban's director of revenue and expense in Kandahar. PE 12 at 1; PE 82 (ISN 579 MFR (May 28, 2002)) at 1-2. Indeed, the petitioner admitted during a September 2003 interrogation that on another occasion, Taliban leadership in Kandahar directed him to transfer four to five million Afghan rupees to the Taliban Intelligence Agency, headquartered in Herat, as a type of "emergency operating fund" or "a one-time budget allowance." GE 46 at 2. These statements, which do not appear to have been elicited through undue coercion or duress, are highly consistent

In light of these considerations, the court concludes that and the September 2003 interrogation report corroborate one another and constitute reliable evidence that even in discharging his "civilian" duties, the petitioner operated within the Taliban's formal command structure and provided material support to the Taliban's military forces and security apparatus.

Although the petitioner has attempted to depict his role within the Taliban as that of a mere functionary, mechanically carrying out directives imposed by the Taliban's central leadership in Kandahar, *see, e.g.*, GE 46 at 2, the evidence simply does not support that



SECRET

characterization. To the contrary, the petitioner admitted during his ARB testimony that while he was the Governor of Herat, he served as part of a Taliban delegation that met with senior Iranian officials on January 7, 2001 to discuss a variety of matters, including the Taliban's ongoing conflict with the Northern Alliance. GE 71 at 7. The petitioner did not deny that one of the topics discussed at the meeting was the possibility of U.S. intervention in the region and Iran's purported desire to see the Taliban "join the Northern Alliance in order to defend Afghanistan." *Id.*

The petitioner's admissions are corroborated





~~SECRET~~

Finally, the court notes ███████████████ [30] the petitioner

acknowledged ████████████████████████████████

These statements indicate, however, that far from being sequestered from the Taliban's military apparatus, the petitioner wielded at least a degree of control over military matters, a fact that is consistent with the Taliban's governance model as well as the petitioner's demonstrated knowledge about military installations in Herat.

The petitioner notes that both Motawakil and Rocketi stated that the provincial governorship was a purely civilian post with no nexus to military matters. PE 36, Att. B at 1; PE 43, Att. B at 5-6.



---

[30]     The reliability of this interrogation report is unquestioned, as the petitioner has himself relied on other portions of the report to support his petition and there is nothing to suggest that the petitioner's statements were elicited through undue coercion or duress. *See* PE 35 at 1-2.



SECRET

█████████████████████ Although the petitioner has also asserted that all of the military matters in Herat fell within the authority of his deputy, Mullawi Hanan, or Abdul Salam Rocketi, the corps commander of Herat, PE 19 (ISN 579 Knowledgeability Brief (May 12, 2002)) at 1-2, this claim is not consistent with his demonstrated knowledge about military installations in Herat, *see, e.g.*, GE 46 at 1-2, the fact that Hanan's office was located "on the other side of the room" from his own, *id.* at 1, ███████████████████████████████ ████████████████ or the fact, discussed below, that the petitioner – rather than Hanan or Rocketi – participated in the October 2001 meeting with Iranian officials regarding Iran's offer to supply military aid to the Taliban, *see* GE 60 (ISN 579 FD-302 (June 2, 2002)) at 2-3.

In sum, the court is not persuaded by the petitioner's contention that he was a civilian functionary shielded from the Taliban's military operations during the time he served as the Governor of Herat. Rather, in light of the Taliban's governance model, pursuant to which provincial governors possess both military and civilian authority, the fact that the petitioner's predecessor as Governor of Herat was a seasoned military commander, the petitioner's possession of detailed and sensitive information about military installations, weapons caches and the capabilities of weapons systems, the fact that the petitioner acted within the Taliban's command structure and provided material support to the Taliban's military and security forces and the petitioner's participation in a high-level meeting with senior Iranian officials, which touched on military and security matters, the court concludes that the petitioner possessed military responsibilities during his tenure as Governor of Herat up until the time of the U.S.-led invasion of Afghanistan.



SECRET

### e. The Petitioner's Support of Taliban Forces in Hostilities Against the United States

After the terrorist attacks on September 11, 2001, the United States and coalition forces initiated Operation Enduring Freedom and commenced attacks on Taliban and al-Qaida forces in Afghanistan on October 7, 2001. GE 91 ¶ 5. By mid-November, the Taliban had lost control of Mazar-e-Sharif, Herat and Kabul. *Id.* ¶¶ 6-8. The Taliban lost control of Kandahar on December 7, 2001. *Id.* ¶ 9.

In early October 2001, on the eve of Operation Enduring Freedom, the petitioner participated in a high-level meeting with Iranian officials regarding the imminent U.S.-led invasion of Afghanistan. According to the petitioner, "[Iran] contacted unnamed Taliban officials in Kandahar . . . to request [a] meeting and offer military aid to the Taliban against U.S. and Allied forces. The meeting was approved in Kandahar by Abdul Mulawi." GE 60 at 2; *see also* GE 57 (IIR 6 034 0442 02) at 1 (interrogation report from May 2002 in which the petitioner states that "Iranian officials contacted [unidentified] Taliban officials in Kandahar . . . and requested a meeting on the Iran-Afghanistan border near Herat . . . in October 2001"). According to the petitioner, the meeting took place at a military post south of Islam Qalah on the Iranian side of the border. GE 56 (IIR 2 340 6656 02) at 1; GE 60 at 2.

The petitioner has repeatedly acknowledged that he served as a member of the Taliban envoy that attended this meeting. GE 56 at 1; GE 57 at 1; GE 60 at 1; GE 70 at 2.[31] According to the petitioner, the members of the Taliban delegation were Abdul Hamid Akundzada and Qari

---

[31] The petitioner asserts that some of the petitioner's statements regarding the October 2001 meeting with Iran resulted from interrogations that occurred while the petitioner was subjected to sleep deprivation in March 2002. Petr's Proposed Findings of Fact at 89 n.59. The petitioner has, however, provided repeated consistent accounts of this meeting during his CSRT testimony in November 2004, GE 70 at 2, and his ARB hearing in June 2006, GE 71 at 8, undermining any inference that his accounts are unreliable as the result of undue coercion. *See Al-Adahi v. Obama*, 692 F. Supp. 2d 85, 100 (D.D.C. 2010) (concluding that the detainee's CSRT statements were not tainted by evidence of coercion during prior interrogations).



SECRET

Tahair, who had previously worked with the Iranians, Abdul Manan Niazi, the Governor of

Kabul who had overseen the massacre at Mazar-e-Sharif in August 1998, and the petitioner. GE

56 at 1; GE 57 at 1; GE 60 at 1. The Iranian delegation included the Deputy Commander of the

Iranian Foreign Intelligence Service and the Head of the Afghan Department of the Iranian

Foreign Intelligence Service. GE 56 at 1; GE 57 at 1; GE 60 at 1.

The petitioner has provided highly detailed and consistent accounts of what took place

during that October 2001 meeting. For instance, during a March 2002 interrogation, the

petitioner stated that at the October 2001 meeting,

> the Iranian delegation offered to purchase for the Taliban hand-held Russian
> manufactured, anti-aircraft missiles, which are superior to Stinger missiles. The
> Iranians claimed these missiles could fire to a higher elevation than a Stinger
> missile The Iranians referred to the missile as a SAM *haft* (Field Comment – the
> word *haft* means the number seven in the Persian-Afghan language). The
> Iranians refused to give more information on the missiles until the Taliban
> delegation proved they had money to buy the missiles. The Iranians also said
> they would buy other military equipment for the Taliban, but would not identify
> the type of equipment until the Taliban delegation proved they had enough
> money .... The Iranians also offered to open the [Iran]/[Afghanistan] border for
> Arabs traveling to and from [Afghanistan]. The Iranians would let any Arab past
> their border checkpoints entering [Afghanistan].

GE 56 at 2.

The petitioner provided a highly consistent account during a May 2002 interrogation,

stating that "Iranian officials offered to broker a peace between the Taliban and the Northern

Alliance so Muslims could unite against the United States. The Iranian officials said that Iran

could track all movements by the United States." GE 57 at 1. According to the petitioner,

"Iranian officials also offered to sell the Taliban SAM-7 missiles and other [unidentified]

weapons if the Taliban could prove that they had the money to buy them. The Iranians also

offered to open their border to Arabs entering Afghanistan. The Afghanistan officials were

directed to take the offers to Mullah ((Omar)) and send back a response." *Id.* at 2.



SECRET

Likewise, during an interrogation [2]       , the petitioner stated that during

the October 2001 meeting,

> [t]he Iranians offered the following to the Taliban:
> - Soviet-made SA-7 shoulder-fired anti-aircraft missiles (which were billed as being better than U.S. Stinger missiles)[;]
> - other unspecified military equipment (which Khairkhwa assumed was also Russian-made)[; and]
> - an offer to allow an open border between [Iran] and [Afghanistan] to allow Arabs from Gulf States unfettered access to [Afghanistan] in order to help the Taliban against U.S. and Allied forces.

GE 60 at 3. The petitioner also noted that the Iranians indicated their ability to monitor the

activities of the U.S. military. *Id.* According to the petitioner, "[t]he Iranians had told [him] that

'We are following them (the U.S.) everywhere. Khairkhwa was unsure if they meant that they

had satellite capability, but thought the Iranians were speaking figuratively rather than literally

regarding intelligence collection." *Id.*

The petitioner also acknowledged during his CSRT hearing that he was present at the

October 2001 meeting during which Iran pledged to assist the Taliban in their war with the

United States, GE 70 at 2, and testified during his ARB hearing that at the October 2001

meeting, "[t]he Iranians offered to buy weapons for us because we were on restriction and could

not buy them. That is the truth." GE 71 at 8.

These statements, given at different times during the petitioner's detention, are highly

consistent with one another, and there is no evidence that these statements are unreliable because

they were elicited through undue coercion or duress. Accordingly, the court considers these

statements reliable evidence that the petitioner was part of the Taliban delegation that met with

Iranian officials to discuss Iran's offer to provide the Taliban with military aid on the eve of the

U.S.-led invasion of Afghanistan.

SECRET

63

SECRET

The petitioner has contended that it is implausible that the Iranians would have offered to provide military assistance to the Taliban because Iran considered the Taliban an arch-enemy and allied itself with the United States and the Northern Alliance during Operation Enduring Freedom. *See, e.g.*, Mar. 31 Tr. at 100-01; PE 110 ¶¶ 25-30; PE 111A ¶¶ 10-16; PE 75 at 246-54; PE 78 at 2-3. The court finds these arguments unpersuasive. As an initial matter, the petitioner's theory – that Iran could not have offered any military assistance to the Taliban because Iran and the Taliban were enemies – does not adequately account for the complexity of international relationships in that region. As noted in an article cited by the petitioner, "Iran has played all sides of the Afghan conflict," having provided military support to different, competing groups vying for control of Afghanistan before and after the fall of the Taliban. PE 75 at 2-3. Indeed, even as the United States and Iran ostensibly allied themselves during Operation Enduring Freedom, "Iran also sent large stocks of weapons to Herat and [Afghan warlord Ismail] Khan, which culminated in the United States firing a cruise missile at Khan's Headquarters, killing eighteen of his men in January 2002." *Id.* at 3.

As noted in another article cited by the petitioner, former CIA Director George Tenet declared in early 2002 that Iran's initial signs of cooperation had "eclipsed" and that "while Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence. This seeming contradiction in behavior reflects deep-seated suspicions among Tehran's clerics that the US is committed to encircling and overthrowing them." PE 76 at 248. Yet another article cited by the petitioner states that "[i]n early 2007, Washington reported that Iran had started to supply sophisticated arms to the Taliban in western Afghanistan," even as it "increased political and military support to the former Northern Alliance." PE 78 at 3. Although Karzai stated in his declaration that evidence of



SECRET

Iranian support for the Taliban reflects a recent shift in Iranian policy towards the Taliban, PE 110 ¶ 29, these reports indicate Iran did not possess a unitary attitude towards the U.S.-led invasion of Afghanistan at the time of Operation Enduring Freedom and underscores the difficulty of presuming that Iran would not have offered military support to the Taliban simply because of their history of animosity.

Moreover, the petitioner himself is the source of the information regarding the October 2001 meeting between the Taliban delegation and senior Iranian officials. As previously noted, the petitioner has provided multiple, consistent accounts of Iran's offer to provide the Taliban with military assistance. The petitioner has offered no explanation for why he would have fabricated this information during his interrogations. Indeed, in his proposed findings of fact, the petitioner acknowledges that he attended the October 2001 meeting with the Iranian delegation, though he does not expressly concede that the purpose of the meeting was Iran's offer to provide military support to the Taliban. *See* Petr's Proposed Findings of Fact ¶ 292.

The petitioner also contends his mere attendance at the October 2001 meeting does not support his detention because he was simply there to provide security for the Taliban delegation. GE 71 at 2, 7. The court disagrees. First, even if the petitioner's role was limited to providing security for the Taliban delegation, that fact would itself significantly undercut the petitioner's contention that he was simply a civilian bureaucrat and would demonstrate that he possessed command authority over Taliban forces on the eve of the U.S.-led invasion and was entrusted with providing security services in support of a military-related mission. At any rate, the fact that the petitioner was included in the substantive discussions, *see, e.g.*, GE 70 at 2-3, coupled with his demonstrated knowledge about missile systems, his military oversight responsibilities as the Governor of Herat and his close ties to Mullah Omar, *see infra* Part IV.B.3, suggest that the



SECRET

petitioner attended the October 2001 meeting not simply as the Taliban's chief security officer, but as a Taliban representative.

Finally, the petitioner contends that his attendance at the October 2001 meeting does not support the lawfulness of his detention because there is no evidence that the Iranian offer was ever accepted. The court notes at the outset that the petitioner has provided differing accounts of the Taliban's response to the Iranian offer. *See* GE 60 at 3 ("Ultimately, the offer was rejected."); GE 71 at 8 ("When the delegation went back to Kandahar the bombing started, so the proposition fell apart."); GE 57 at 2 ("[The petitioner] fled the area shortly after the meeting and does not know if the offer was ever given to Omar."). At any rate, the significance of this evidence does not turn on whether the Taliban accepted the Iranian offer, but rather, lies in the fact that Taliban leaders in Kandahar designated the petitioner to represent the Taliban in high-level discussions with senior Iranian officials regarding Iran's offer to provide military assistance to the Taliban in preparation for the imminent U.S.-led invasion. The petitioner's selection to attend the meeting demonstrates that he was entrusted with significant military-related responsibilities at the time of the outbreak of hostilities with the United States and strongly indicates that he was part of Taliban forces at that time.[32]

The petitioner's role in the October 2001 meeting is consistent with evidence that after the commencement of Operation Enduring Freedom, the petitioner continued to operate within the Taliban's formal command structure and provide support for Taliban military forces.

---

[32]    The government has argued that the petitioner attended a second meeting with Iranian officials in November 2001 regarding Iran's offer to provide military assistance to the Taliban. *See* GE 45 at 3; GE 61 at 1-2. It appears, however, that the November 2001 meeting referred to in these exhibits and the October 2001 meeting discussed above are one and the same. *See* GE 45 at 3; GE 61 at 1-2.



66

SECRET



The report is also consistent with the prior reports regarding the petitioner's role in providing financial support for Taliban troops and security forces, *see* GE 46 at 2;      as well as the petitioner's prior acknowledgment that Herat contained the Taliban's two largest military divisions and multiple military installations, *see*      GE 43 at 2; GE 46 at 1. Accordingly, the court concludes that this intelligence report is sufficiently reliable for the court's consideration and further demonstrates that the petitioner continued to operate within the Taliban's formal command structure and provide support to Taliban troops after the outset of hostilities with U.S. coalition forces.

The petitioner's involvement with the Taliban's military apparatus continued even as U.S. coalition forces pushed the Taliban out of northern Afghanistan. Although the petitioner has provided contradictory accounts of his retreat from Herat, the petitioner has stated that in early November 2001, as the bombs began to fall in Herat province, he traveled in a convoy of ten vehicles to Arghastan, a village in the eastern part of Kandahar province. GE 18 (ISN 579

SECRET

MFR (May 7, 2002)) at 1. According to the petitioner, the vehicles in his convoy "were full of weapons." *Id.* The petitioner stated that he "turned the weapons over to a sherif in Arghastan and then called Hamid ((Karzai)) to discuss turning himself in." *Id.*

Although the petitioner would later deny that the vehicles in the convoy contained weapons, *see* GE 71 at 6, the court sees no reason to doubt the admission made during the May 2002 interrogation. There is no evidence that this statement was elicited through undue coercion or duress, and the statement was made shortly after the events at issue. *See* GE 18 at 1. Accordingly, the court credits the petitioner's initial admission that he fled to Kandahar in a convoy comprised of ten vehicles that were full of weapons.

The fact that the petitioner had access to a large volume of weapons demonstrates that he continued to wield military-type authority even after the U.S.-led invasion of Afghanistan. Furthermore, although the petitioner contends that he turned the weapons over to an official in Arghastan affiliated with the post-Taliban government, this claim is not plausible, as the Taliban did not lose control of Kandahar until December 7, 2001, weeks after the petitioner fled Herat for Arghastan. GE 91 ¶ 9. Accordingly, if, as the petitioner has stated, he surrendered the weapons in his convoy to a local "sherif" in Arghastan, it would have been to a local Taliban official.

Accordingly, reliable evidence demonstrates that the petitioner was appointed to represent the Taliban in discussions with high-level Iranian officials regarding Iran's offer to provide the Taliban military assistance for use against U.S. coalition forces. Reliable evidence also indicates that after the U.S.-led invasion, the petitioner continued to provide material support to Taliban forces stationed in Herat and facilitated their movement to other areas in Afghanistan, implementing orders issued by Taliban leadership in Kandahar. Finally, the petitioner has admitted that in early November 2001, he retreated from Herat to the Taliban-



68

SECRET

stronghold of Kandahar in a convoy of vehicles full of weapons, and that he delivered those weapons to officials in Kandahar.

These findings are consistent with the evidence establishing the petitioner's long history of involvement with the Taliban's military affairs. Like most senior Taliban leaders, the petitioner obtained military experience fighting with the Afghan mujahideen during the Soviet occupation. After joining the Taliban in 1994, the petitioner was entrusted with military responsibilities, sitting on the Taliban's Supreme Shura, which had oversight over military affairs and serving as a commander of Taliban fighters during the Taliban's northern offensives in 1997 and 1998. The petitioner remained intimately involved in the Taliban's military affairs even after being appointed Governor of Herat, as demonstrated by his detailed knowledge about military installations and weapons systems, his facilitation of funding for Taliban military and intelligence forces as well as his role as a Taliban representative during discussions with Iranian officials in January 2000 regarding military and security-related matters.

Together, this evidence establishes that the petitioner was part of the Taliban forces engaged in hostilities with U.S.-led coalition forces in late 2001. Accordingly, so long as the evidence indicates that the petitioner remained a part of those forces and had not disassociated himself from the Taliban by the time of his capture in early 2002, the petitioner's detention is lawful under the AUMF. Before turning to the issue of disassociation, however, the court briefly addresses the evidence concerning the petitioner's ties to Mullah Omar, which the government contends provides additional support for the lawfulness of his detention.

### 3. The Petitioner Had Close Ties to Mullah Omar

Since his apprehension in early 2002, the petitioner has sought to portray himself as a reluctant Taliban leader. The petitioner has stated that he "was compelled to work for the



69

SECRET

Taliban because they were in power at the time and, if one didn't, the Taliban could 'create problems' for someone." GE 45 at 1. The petitioner has suggested that he joined the Taliban as a matter of happenstance, stating that while trying to secure a job in Spin Boldak in 1994, "one day, an unknown Taliban member asked him to speak with a London, England BBC reporter on the phone regarding Taliban military positions. The Taliban were so impressed with his speaking abilities they offered him the position of 'wayand,' or spokesman for the Taliban." GE 20 at 1. He has characterized his appointment as Governor of Herat as a move that came out of the blue. *Id.* at 2 ("Taliban official recommended he be appointed Governor of Herat, [Afghanistan], for unknown reasons."). In fact, during various interrogations, the petitioner denied holding leadership positions that he now concedes that he possessed. *Compare* GE 71 at 3 ("I was not the Taliban spokesman.") *and* GE 43 at 1 (the petitioner's statement that "he was often mistaken as the Minister of the Interior for the Taliban because he lived at the Ministry and spoke to the press often") *with* Petr's Proposed Findings of Fact ¶ 6 ("After his return to Afghanistan in 1994, petitioner was appointed spokesperson for the Taliban government for the Pashto language because of his proven abilities in providing information to the media."); GE 91 ¶ 17 (stipulating that the petitioner became the Taliban's Acting Interior Minister in 1996 or 1997).

Despite these efforts to portray himself as a reluctant, marginal Taliban figure, the evidence indicates that the petitioner was, in reality, a prominent and influential leader within the Taliban. For instance, as previously discussed, the petitioner quickly rose to the Taliban's highest ranks, becoming a member of the Supreme Shura, "the most powerful ruling body" in the Taliban government, GE 48 at 250, which reported directly to Taliban leader Mullah Omar, PE 110 ¶ 19.

SECRET

SECRET

The evidence also indicates that after the petitioner began to serve on the Supreme Shura, he became one of Mullah Omar's trusted allies. The statements of this mullah are corroborated by veteran Afghan mujahideen commander Akhtiar, who identified the petitioner as "a sub-commander/trusted person of Mullah Omar." GE 22 at 1.

These statements are further corroborated by a November 1999 article published in the Pakistani newspaper, *The News*, reporting on Mullah Omar's decision to reshuffle the Taliban leadership. GE 40 (*Editorial: Taleban Reshuffle*, THE NEWS, Nov. 1, 1999) at 1. This reshuffle resulted in the petitioner's appointment as Governor of Herat. *Id.* The article stated that "[l]oyalists like Mulla Khairullah Khairkhwa, Mulla Abdur Razzaq . . . and Mulla Said Mohammad Haqqani were all rewarded with the choicest jobs." *Id.*

The petitioner's status as one of Mullah Omar's trusted associates is also born out by the fact that Mullah Omar repeatedly appointed the petitioner to serve in prominent and sensitive posts. In July 1998, Mullah Omar appointed the petitioner to oversee the areas captured during the Taliban's northern offensive. GE 3 at 2. In August 1998, when Iran threatened war with Afghanistan after the Taliban murdered eight Iranian diplomats and an Iranian journalist, Mullah Omar publicly announced that the petitioner would lead a commission to investigate the murders.[33] GE 13 (*Bodies of Remaining 2 Iranians Found in Afghanistan*, THE NEWS, Oct. 7, 1998) at 1; GE 46 at 2. And one year after Iran had threatened war with Afghanistan, Mullah

---

[33] The petitioner stated that despite the public announcement, he never actually conducted the investigation. GE 46 at 2.

SECRET

Omar appointed the petitioner Governor of Herat, GE 43 at 2, one of Afghanistan's largest provinces, which shares an extensive border with Iran, *see* GE 92.

PE 35 (ISN 579 CITF Report (Dec. 2, 2002)) at 1. According to the petitioner, Mullah Omar's decision to appoint him Governor of Herat was effectively a demotion and signaled the fact that the petitioner no longer held Mullah Omar's trust. Mar. 31 Tr. at 113.

The weight of the evidence does not support the petitioner's contention. Herat was a strategically important province at the time of the petitioner's appointment as governor; it bordered Iran, which had recently threatened war with the Taliban and possessed historically close ties with the population of Herat. PE 75 at 3; PE 76 at 244-45. Herat also contained numerous Taliban military installations, including its two largest divisions, as well as the headquarters of Taliban intelligence. GE 46 at 1. Indeed, as previously noted, one contemporaneous media report characterized the petitioner's new position one of the "choicest jobs" in the Taliban government, awarded to the petitioner because he was a Mullah Omar loyalist. GE 40 at 1.

Moreover, reliable evidence indicates that the petitioner remained within Mullah Omar's inner circle after his appointment as Governor of Herat, as U.S. coalition forces began their assault on Taliban forces. Specifically, the court credits an October 13, 2001 intelligence report citing information provided by a[1]                                                  *See* GE

72

SECRET

27 (IIR 6 931 0020 02) at 1. ███████████████████████

███████████████ stated that after a U.S. cruise missile had hit Mullah Omar's vehicle one

week earlier during air strikes in Kandahar, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Although the report does not identify the ████████████ on whom it relies, it

specifically notes that this officer has ████████████ *Id.* The reliability of the

report is also buttressed by the level of detail contained in the officer's account, including

specific information regarding the locations of Taliban commanders that has been independently

corroborated. *See id.* at 2 (reporting that Mullah Rocketi, the "corps commander of Jalalabad[,]

moves between that city and north Kabul"); PE 70 at 139 (listing Rocketi as the "former corps

commander of Jalalabad"). Lastly, the report of a missile strike occurring the week before

October 13, 2001 is consistent with the timeline of Operation Enduring Freedom, which

"commenced on 7 October 2001 with coalition air strikes on al-Qaida and Taliban targets

throughout Afghanistan." GE 77 at 2. In light of these indices of reliability, the court credits the

report's account that after a U.S. coalition airstrike in early October 2001, Mullah Omar limited

his circle of contacts to a handful of his most trusted and important "commanders," including the

petitioner.

In sum, the court finds implausible the petitioner's contention that he was a reluctant

Taliban member. Rather, the weight of the evidence indicates that the petitioner had close ties



SECRET

with Mullah Omar and that he remained one of Mullah Omar's most trusted associates before and after the U.S.-led invasion of Afghanistan in October 2001. This finding is consistent with the court's earlier conclusions that the petitioner was a key Taliban leader entrusted with military responsibilities, which he carried out both before and after the commencement of Operation Enduring Freedom. *See supra* Part IV.B.2. Moreover, the fact that the petitioner was one of Mullah Omar's trusted associates undermines the petitioner's contention that he was a simple civilian bureaucrat shielded from the Taliban's military activities, and provides a useful starting point for assessing the petitioner's contention that he had disassociated himself from the Taliban by the time of his capture in early 2002.

### 4. The Petitioner Remained Part of the Taliban at the Time of His Apprehension

As previously discussed, it is not enough for the government to show simply that the petitioner was, at one time, a member of the Taliban, al-Qaida or associated forces; to be lawfully detained, the petitioner must have been "part of" those forces at the time of his capture. *See Salahi*, 625 F.3d at 751; *Gherebi*, 609 F. Supp. 2d at 71. "A petitioner who may once have been part of al-Qaida or the Taliban can show that he was no longer part of such an entity at the time of capture by showing that he took affirmative actions to abandon his membership." *Khalif v. Obama*, 2010 WL 2382925, at *2 (D.D.C. May 28, 2010) (citing *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 128-30 (D.D.C. 2009)).

The evidence indicates that after the commencement of Operation Enduring Freedom, the petitioner began hedging his bets. The petitioner has stated that he met with a group of high-level Taliban officials one month before the surrender of Kandahar to discuss the peaceful surrender of the city. PE 34 at 1. According to the petitioner, the meeting was held without Mullah Omar's consent and the officials present were those "who favored a bloodless, peaceful

SECRET

74

SECRET

end to the fighting in Afghanistan." *Id.* The petitioner has also stated that in early November 2001, he contacted Hamid Karzai, who was a member of the petitioner's Popalzai tribe and whom the petitioner had known for many years, to "solicit his advice" about surrendering to U.S. coalition forces. GE 45 at 3; *see also* GE 18 at 1 (interrogation report in which the petitioner stated that he contacted Hamid Karzai to discuss surrendering after the United States began bombing Afghanistan); GE 70 at 4 (petitioner's CSRT testimony in which he states that he contacted Hamid Karzai "when Herat was taken over"); GE 91 ¶ 7 (stipulating that the Taliban lost control of Herat on or about November 13, 2001). According to the petitioner, this evidence demonstrates that he had disassociated himself from the Taliban before he was captured by Pakistani authorities in late-January or early-February 2002. *See* GE 91 ¶ 18.

The court disagrees. Even if the petitioner did participate in a secret meeting with high-level Taliban leaders regarding the surrender of Kandahar, there is no evidence that any participant at that meeting surrendered to U.S. coalition forces, publicly or privately broke with Mullah Omar or took any action signaling an intent to end hostilities with U.S. coalition forces. Indeed, in the month before the surrender of Kandahar, there was fierce fighting between U.S. coalition and Taliban forces for control of the city until it fell on December 7, 2001. GE 77 at 4.

Likewise, even if the petitioner contacted Hamid Karzai in mid-November 2001 to discuss the possibility of surrender, the petitioner did not turn himself in, but was instead captured in Chaman, Pakistan approximately three months later. GE 91 ¶ 18. The petitioner has provided no credible explanation for what he was doing or what steps he had taken to disassociate himself from the Taliban during the months after he allegedly contacted Hamid Karzai to discuss the possibility of surrender.

75

SECRET

The petitioner has stated that by the time of his capture, he had resolved to cooperate with U.S. coalition forces and that he traveled to Chaman, Pakistan to obtain treatment for a stomach ailment before turning himself in. GE 45 at 3; GE 70 at 4; GE 71 at 9. The petitioner, however, was not captured at a medical office in Chaman. Rather, it is undisputed that the petitioner was captured at the Pakistani residence of senior Taliban official Abdul Manan Niazi. GE 91 ¶ 18. As previously discussed, Niazi was a former Taliban military commander and Governor of Kabul, who had personally overseen the massacre of thousands of Shiites in the city of Mazar-e-Sharif in August 1998 and was part of the Taliban delegation that traveled to Iran in October 2001 to discuss Iran's offer to provide military assistance to the Taliban. *See supra* Part IV.B.2.a. The fact that the petitioner was captured at the home of a hardline Taliban military commander greatly undermines the petitioner's contention that he had disassociated himself from the Taliban prior to his apprehension by Pakistani authorities. *See Al-Bihani v. Obama*, 2010 U.S. Dist. LEXIS 107590, at *33-34 (D.D.C. Sept. 22, 2010) (noting that the fact that the petitioner continued to associate with al-Qaida or Taliban operatives undermined the petitioner's argument that he had cut his ties with al-Qaida prior to his apprehension); *cf. Uthman v. Obama*, 2011 WL 1120282, at *4 (D.C. Cir. Mar. 29, 2011) (observing that evidence that the petitioner was captured in the company of Taliban and al-Qaida fighters in the vicinity of Tora Bora supported the conclusion that he was lawfully detained).

The petitioner's claim that he had resolved to cooperate with U.S. coalition forces prior to his capture is also undermined by the evasiveness he exhibited during his discussions with U.S. interrogators. According to the government, the earliest known interrogation of the petitioner occurred[2]                at approximately 3:00 p.m. *See* Govt's Proposed Findings of Fact & Conclusions of Law at 82. The interrogator who conducted this inquiry reported that the

SECRET

SECRET

petitioner "attempted to evade questions" and noted that "caution should be used when dealing with the detainee as he attempts to draw in the interrogator and 'tap dance' around questions." GE 64 (ISN 579 Handnote (Feb. 7, 2002) at 1.

The petitioner's refusal to provide full cooperation has been noted by other interrogators, who, as previously noted, have described the petitioner as cunning and evasive. *See* PE 34 at 1. The resistance exhibited by the petitioner during these interrogations is not, in the court's view, consistent with the petitioner's claim that he had decided to turn himself in and cooperate with U.S. coalition forces before he was apprehended in Pakistan.

In short, the court does not credit the petitioner's contention that he had disassociated himself from the Taliban prior to his capture in Chaman, Pakistan. Rather, the weight of the evidence, especially the fact that he was captured at the home of a senior Taliban official, indicates that the petitioner remained part of Taliban forces at the time of his capture.

### C. Viewing the Totality of the Evidence

There is no dispute about the basic contours of the petitioner's life. The parties agree that the petitioner joined the Taliban in 1994 and became a spokesman and district administrator in Spin Boldak. He rose through the Taliban ranks and served as a member of the Taliban Supreme Shura, the Taliban's Acting Interior Minister and the Governor of Herat. The petitioner retreated from Herat during Operation Enduring Freedom and that he was ultimately captured by Pakistani authorities in Chaman, Pakistan in early 2002.

The parties have, however, offered two starkly different narratives regarding the petitioner's tenure with the Taliban. The petitioner contends that he was simply a civilian bureaucrat who had no involvement with the Taliban's military forces, lost Mullah Omar's trust over time and eventually broke with him and the Taliban during Operation Enduring Freedom.



SECRET

According to the government, the petitioner was an experienced military leader who wielded military authority before and after the commencement of Operation Enduring Freedom, was a member of Mullah Omar's inner circle and remained part of the Taliban even after the time of his capture in early 2002.

Viewed in its totality, the evidence provides more support for the government's narrative. The court concludes that the petitioner, like most other senior Taliban leaders, fought with the Afghan mujahideen in the 1980s, and, like other senior Taliban leaders with civilian titles, participated in the Taliban's military efforts to seize control of Afghanistan, serving as a commander of Taliban fighters during the Taliban's assaults on Mazar-e-Sharif in 1997 and 1998. Even after his appointment as Governor of Herat in 1999, the petitioner remained integrally involved in the Taliban's military forces, operating within the Taliban's formal command structure and facilitating the movement of Taliban troops both before and after the commencement of Operation Enduring Freedom. Moreover, on the eve of Operation Enduring Freedom, the petitioner was dispatched to Iran by Taliban leaders in Kandahar to discuss Iran's offer to provide military assistance to the Taliban in anticipation of the imminent U.S.-led invasion of Afghanistan.

Throughout his tenure in the Taliban, the petitioner remained a prominent leader and a close ally of Mullah Omar. The petitioner's ties to Mullah Omar persisted even after a U.S. cruise missile struck Mullah Omar's vehicle in the early days of Operation Enduring Freedom, and Mullah Omar limited his contacts to his most trusted lieutenants, including the petitioner.

Although the petitioner reached out to Hamid Karzai to discuss the possibility of surrender after the commencement of Operation Enduring Freedom, he never turned himself in and was captured at the home of a senior Taliban official. The evidence, therefore, does not



SECRET

support the petitioner's contention that he had disassociated himself from the Taliban by the time of his capture.

Based on these considerations, the court concludes that the government has established by a preponderance of the evidence that the petitioner was part of Taliban forces engaged in hostilities against the United States at the time of his capture. The petitioner is therefore lawfully detained and his petition for a writ of habeas corpus must be denied.

## V. CONCLUSION

For the foregoing reasons, the court denies the petition for a writ of habeas corpus. An Order consistent with this Memorandum Opinion is issued separately and contemporaneously this 27th day of May, 2011.

RICARDO M. URBINA
United States District Judge

